BRENT J. NEWELL (State Bar No. 210312)
LAW OFFICES OF BRENT J. NEWELL
245 Kentucky Street, Suite A4
Petaluma, CA 94952
Telephone: (661) 586-3724
Email: brentjnewell@outlook.com

RICHARD T. DRURY (State Bar No. 163559)
VICTORIA YUNDT (State Bar No. 326186)
LOZEAU DRURY, LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
Telephone: (510) 836-4200
Email: richard@lozeaudrury.com
         victoria@lozeaudrury.com

GRECIA OROZCO (State Bar No. 345881)
CENTER ON RACE, POVERTY & THE ENVIRONMENT
1012 Jefferson Street
Delano, CA 93215
Telephone: (562) 659-5314
Email: gorozco@crpe-ej.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| CENTRAL VALLEY AIR QUALITY COALITION, a fiscally sponsored project of Social and Environmental Entrepreneurs, Inc., COMMITTEE FOR A BETTER ARVIN, a nonprofit corporation, COMMITTEE FOR A BETTER SHAFTER, a nonprofit corporation, DELANO GUARDIANS, an unincorporated association, and SOCIAL AND ENVIRONMENTAL ENTREPRENEURS, INC., a nonprofit corporation.<br><br>       Plaintiffs,<br><br>    v.<br><br>SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT, and the GOVERNING BOARD OF THE SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT,<br><br>       Defendants. | Case No.<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

COMPLAINT

# INTRODUCTION

1.    Plaintiffs Central Valley Air Quality Coalition, *et al.* (collectively "Environmental Justice Organizations") file this citizen suit to restore air quality and secure environmental justice in the San Joaquin Valley. The U.S. Environmental Protection Agency ("EPA") demanded an accounting system over two decades ago to ensure Defendants San Joaquin Valley Unified Air Pollution Control District, *et al*. (collectively "Air District") complied with federal offsets requirements that allow for economic development without compromising air quality. But the Air District manipulated the accounting system, the California Air Resources Board ("CARB") exposed the Air District's violations, and the Air District has failed, and continues to fail, to implement the remedies EPA has required. As a result, new and modified major stationary sources have emitted unmitigated air pollution in one of the most polluted air basins, harming communities that already bear a disproportionate burden of pollution relative to the rest of California and the United States.

2.    New and modified major stationary sources of air pollution must offset their emissions with Emission Reduction Credits representing pollution reductions from other sources. The EPA and the Air District designed the accounting system, formally called the Annual Offset Equivalency Tracking System ("Equivalency System"), to allow the Air District to implement offsets under California law as long as the Air District demonstrated equivalency with federal offsets requirements. Because of differences between offsets under state law and federal law, the accounting system requires the Air District to balance the quantity of offsets required by federal law with the quantity of offsets required by state law. Furthermore, because of the differences between Emission Reduction Credit values under state law and federal law, the Air District must show that the value of offsets under state law is equivalent to the value required by federal law.

3.    The Equivalency System includes automatic remedies. If the accounting system shows an offsets quantity deficit or an offsets value deficit, then federal offsets requirements would apply to ensure major stationary sources of air pollution provided, and the public benefited from, valid and appropriate offsets.

4.    The Air District engaged in a series of actions to manipulate the accounting system, improperly claiming the system demonstrated compliance until 2020 when CARB audited the

Equivalency System. The audit exposed Air District actions that allowed thousands of tons of unmitigated air pollution annually into the San Joaquin Valley's already polluted air. The District minimized the amount of federally required offsets on one side of the accounting system's ledger and claimed non-creditable pollution reductions on the other side of the ledger. The Air District has admitted the Equivalency System failed to show compliance with federal offsets requirements. The Air District's own data show that the accounting system accrued massive air pollution deficits for which the Air District should have implemented automatic remedies several years before the CARB Audit.

5. The Air District has allowed and continues to allow federal offset quantity deficits in the Equivalency System of at least 4,321.9 and 2,820.6 tons per year of oxides of nitrogen ("NOx") and volatile organic compounds ("VOC"), respectively. These deficits equate to an amount equivalent to the offsets required for hundreds of new and modified major stationary sources.

6. The Air District has allowed and continues to allow offset value deficits in the Equivalency System to exceed at least 408 and 1,428 tons per year of NOx and VOC, respectively. These deficits equate to the pollution emitted by at least 40 and 142 new and modified major stationary sources for NOx and VOC, respectively, in the San Joaquin Valley.

7. The Air District's violations of the Equivalency System and failure to implement the required remedies harms San Joaquin Valley residents because the unmitigated NOx and VOC contribute to the Valley's severe ozone and fine particulate matter ("PM2.5") air pollution and public health crisis. Low income and communities of color, including those communities identified by CalEnviroScreen as disadvantaged communities, bear a disproportionate burden from air pollution and other environmental injustices. Members of Environmental Justice Organizations live, work, recreate, and raise their families in San Joaquin Valley disadvantaged communities and now seek to enforce the Clean Air Act to improve air quality and secure environmental justice.

8. The Air District has violated and continues to violate the Clean Air Act, has failed to implement the automatic remedies triggering federal offsets requirements, and has failed to correct its annual reports, denying Environmental Justice Organizations and the public the required information in the reports and the health benefits of federally required offsets. This Court should grant injunctive and declaratory relief to remedy the Air District's violations of federal law.

**JURISDICTION**

9.      This Court has jurisdiction over any person who is alleged to have violated or to be in violation of an emission standard or limitation pursuant to 42 U.S.C. § 7604(a)(1) (citizen suit provision of the Clean Air Act) and 28 U.S.C. § 1331 (federal question jurisdiction).

10.      The injunctive and declaratory relief Environmental Justice Organizations request is authorized by 28 U.S.C. §§ 2801(a) and 2202, and 42 U.S.C. § 7604.

11.      On March 21, 2023, Environmental Justice Organizations provided the Air District with written notice of the violations of the emission standard or limitation alleged in this action at least 60 days before commencing this action, as required by Clean Air Act section 304(b)(1), 42 U.S.C. § 7604(b)(1), and 40 C.F.R. §§ 54.2 and 54.3. A copy of the notice letter, sent by certified mail, return receipt requested, is attached as Exhibit 1. Although more than 60 days have elapsed since Environmental Justice Organizations provided written notice, Defendants have failed to correct and submit Offset Equivalency Reports for the reporting periods 2003-2004, 2004-2005, 2005-2006, 2006-2007, 2007-2008, 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-2017, 2017-2018, 2018-2019, 2019-2020, 2020-2021, and 2021-2022 and have failed to implement automatic remedies required by sections 7.4.1.2, 7.4.1.3, 7.4.2.1, and 7.4.2.3 of Rule 2201.

12. The U.S. Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB") have not commenced and are not diligently prosecuting a civil action in a court of the United States or a State to require Defendants' compliance with section 7 of Rule 2201.

**VENUE**

13.      Venue lies in the Eastern District of California pursuant to 28 U.S.C. § 1391(b)(1) because the District has its offices in Stanislaus, Fresno, and Kern counties.

**INTRADISTRICT ASSIGNMENT**

14. Because the violations of an emission standard or limitation alleged in this Complaint relate to the violations of Rule 2201 by the Air District, assignment to the Fresno Division of this Court is proper under Civil Local Rule 120 because the District has offices in Stanislaus, Fresno, and Kern counties.

**PARTIES**

15. Plaintiff CENTRAL VALLEY AIR QUALITY COALITION ("CVAQ") is a project of Social and Environmental Entrepreneurs, Inc., a Delaware nonprofit corporation. CVAQ leads a partnership of organizations in the fight to restore clean air in the San Joaquin Valley. CVAQ's mission is to work toward awareness, act as a watchdog, advocate for policy, and mobilize communities to restore clean air to the San Joaquin Valley. CVAQ's mission includes ensuring that all communities – of all races, cultures, classes, and creeds – have the opportunity to be involved in policy development and the regulatory processes improving regional health. CVAQ has an office in Stockton, California.

16. Plaintiff COMMITTEE FOR A BETTER ARVIN is a California nonprofit corporation based in Arvin, California. CBA's mission is to improve the quality of life in Arvin, to inform and unite the community, to address problems facing the community, and to secure equality for all residents. CBA and its members have engaged in advocacy for improved local and regional air quality for many years and are especially concerned about the impacts of oil and gas production and refining in the San Joaquin Valley.

17. Plaintiff COMMITTEE FOR A BETTER SHAFTER is a California nonprofit corporation based in Shafter, California. CBS's mission is to advocate for Shafter residents and mobilize the community to address local environmental issues. CBS has engaged in advocacy to improve their local and regional air quality and overall public health and safety. CBS is concerned with the proximity of oil and gas refining and its effects on the community's health and well-being. As a response, CBS has advocated for better air quality in their region through community organizing.

18. Plaintiff DELANO GUARDIANS is an unincorporated association based in Delano, California, and Northern Kern County. The Guardians mission is to advocate for the health and well-being of Delano and Kern County residents. The Guardians are concerned about the impacts of oil and gas production and, as such, have organized their communities to advocate for their public health.

19. Plaintiff SOCIAL AND ENVIRONMENTAL ENTREPRENEURS, INC. is a Delaware nonprofit corporation based in Calabasas, California. The mission of SEE is to empower, encourage, and catalyze projects so that we can collaborate and facilitate progressive change in areas of social and environmental justice.

20. Plaintiffs CENTRAL VALLEY AIR QUALITY COALITION, COMMITTEE FOR A BETTER ARVIN, COMMITTEE FOR A BETTER SHAFTER, DELANO GUARDIANS, and SOCIAL AND ENVIRONMENTAL ENTREPRENEURS, INC. are each a person within the meaning of section 302(e) of the Clean Air Act, 42 U.S.C. § 7602(e), and may commence a civil action under section 304(a) of the Act, 42 U.S.C. § 7604(a).

21. Members of COMMITTEE FOR A BETTER ARVIN, COMMITTEE FOR A BETTER SHAFTER, and DELANO GUARDIANS live, raise their families, work, and recreate in the San Joaquin Valley Air Basin. They are adversely affected by exposure to levels of ozone and fine particulate matter ("PM2.5") air pollution that exceed the health-based National Ambient Air Quality Standards. The adverse effects of such pollution include actual or threatened harm to their health, their families' health, their professional, educational, and economic interests, and their aesthetic and recreational enjoyment of the environment in the San Joaquin Valley.

22. CalEnviroScreen 4.0 ranks Arvin, Shafter, and Delano in the top 25 percent of California Senate Bill 532 Disadvantaged Communities based on CalEnviroScreen 4.0 data. CalEnviroScreen 4.0 ranks Shafter and Delano above the 95th percentile of California census track for exposure to PM2.5. CalEnviroScreen 4.0 ranks Arvin above the 95th percentile of census tracks for exposure to ozone. CalEnviroScreen 4.0 ranks Shafter and Delano above the 80th percentile of census tracks for exposure to ozone.

23. Defendants' violations of the emission standard or limitation causes COMMITTEE FOR A BETTER ARVIN, COMMITTEE FOR A BETTER SHAFTER, and DELANO GUARDIANS members' injuries. The Air District has failed to demonstrate equivalency for NOx and VOC and has failed to submit Offset Equivalency Reports which comply with sections 7.1.2 and 7.2.2 of Rule 2201. The Air District failed to implement automatic remedies required for pre-2020 NOx and VOC equivalency failure and automatic remedies for non-compliant Offset Equivalency Reports. The Air District's failure to implement automatic remedies has allowed new and modified major stationary sources in the San Joaquin Valley to emit unmitigated NOx and VOC air pollution without offsets that comply with federal requirements. The unmitigated NOx and VOC air pollution contributes to additional ozone and PM2.5 air pollution in the San Joaquin Valley and injures the members of COMMITTEE

1   FOR A BETTER ARVIN, COMMITTEE FOR A BETTER SHAFTER, and DELANO GUARDIANS.

2       24. Defendants' violations of the emission standard or limitation injures members of

3   COMMITTEE FOR A BETTER ARVIN, COMMITTEE FOR A BETTER SHAFTER, and DELANO

4   GUARDIANS by denying them the information required by sections 7.1.2 and 7.2.2 of Rule 2201 for

5   NOx and VOC in Offset Equivalency Reports for the reporting periods 2003-2004, 2004-2005, 2005-

6   2006, 2006-2007, 2007-2008, 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014,

7   2014-2015, 2015-2016, 2016-2017, 2017-2018, 2018-2019, 2019-2020, 2020-2021, and 2021-2022. The

8   Air District's violations of an emission standard or limitation cause members' informational injuries

9   because the Offset Equivalency Reports for the reporting periods 2003-2004, 2004-2005, 2005-2006,

10  2006-2007, 2007-2008, 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-

11  2015, 2015-2016, 2016-2017, 2017-2018, and 2018-2019 purport to demonstrate equivalency when in

12  fact the Offset Equivalency Reports have suppressed the quantity of required federal offsets and claimed

13  non-creditable emission reductions to falsely demonstrate NOx and VOC equivalency during those

14  reporting periods. Furthermore, the Air District has caused members' informational injuries by refusing

15  to disclose the information required by sections 7.2.1 and 7.2.2 of Rule 2201 for NOx and VOC in the

16  Offset Equivalency Reports for the reporting periods 2019-2020, 2020-2021, and 2021-2022, thus

17  denying members the ability to review and consider the cumulative shortfalls for NOx and VOC in the

18  Equivalency System.

19      25. Defendants' violation of an emission standard or limitation has injured and continues to

20  injure COMMITTEE FOR A BETTER ARVIN, COMMITTEE FOR A BETTER SHAFTER, and

21  DELANO GUARDIANS' members. The injunctive relief requested in this lawsuit would redress these

22  injuries by compelling the Air District to implement the automatic remedies required by sections 7.4.1.2,

23  7.4.1.3, 7.4.2.1 and 7.4.2.3 of Rule 2201. The automatic remedies would require offsets for major

24  stationary sources in compliance with federal offsets requirements, including federal offsets quantities

25  and Emission Reduction Credits discounted at the time of use, from the deadline for non-compliant

26  Offset Equivalency Reports and the reporting period following Equivalency System failure. The offsets

27  meeting federal requirements would mitigate NOx and VOC emissions from the major stationary

28  sources subject to the automatic remedies and thus reduce ozone and PM2.5 air pollution in the San

COMPLAINT                                   6

Joaquin Valley. The injunctive relief requested in this lawsuit would further redress informational injuries by ordering the Air District to correct the non-compliant Offset Equivalency Reports and to implement automatic remedies for non-compliant Offset Equivalency Reports until the Air District has submitted corrected Offset Equivalency Reports. The declaratory relief requested in this lawsuit would further redress members' injuries by declaring that the Air District has a duty to comply with sections 7.2.1 and 7.2.2 of Rule 2201, has a duty to implement the automatic remedies required by sections 7.4.1.2, 7.4.1.3, 7.4.2.1 and 7.4.2.3 of Rule 2201, and has violated those duties.

26. The Air District's violations of the emission standard and limitation injure Plaintiffs CENTRAL VALLEY AIR QUALITY COALITION ("CVAQ") and SOCIAL AND ENVIRONMENTAL ENTREPRENEURS, INC. The District's implementation of the Equivalency System has frustrated CVAQ's mission to ensure that clean air is restored to the San Joaquin Valley and that San Joaquin Valley communities have the opportunity to be involved in the policy development and regulatory processes that improve regional health. CVAQ has diverted and continues to divert its staff and financial resources normally used to educate decision makers, train, and empower Valley residents, and advocate for improved public health when it allocated resources to discover, disclose, and respond to the District's violations of the Equivalency System and the District's efforts after 2020 to avoid compliance with Rule 2201 automatic remedies. CVAQ diverted resources to participate in the ERC Public Advisory Workgroup. CVAQ diverted resources to sponsor and support Assembly Bill 985 in the California Legislature, a bill currently pending that would reform the Air District's Emission Reduction Credits and the Equivalency System.

27. The Air District's violations of the emission standard and limitation injure Plaintiffs CENTRAL VALLEY AIR QUALITY COALITION and SOCIAL AND ENVIRONMENTAL ENTREPRENEURS, INC. because the diversion of CVAQ's resources have impaired and continue to impair CVAQ's mission. CVAQ's limited staff and financial resources that CVAQ has diverted did not support other, ongoing CVAQ campaigns, policy initiatives, and internal operations to advance CVAQ's mission. To advance its mission, CVAQ staff draft comments, appear at public hearings, educate CVAQ members and Valley residents during trainings, and support policy change at the Air District, CARB, and in the California Legislature. CVAQ's Executive Director, Dr. Catherine Garoupa, has spent and

continues to spend a significant portion of her time on Equivalency System-related activities which precludes her from CVAQ management, fundraising, coalition support, and programmatic policy advocacy activities.

28. The District's violations of an emission standard and limitation cause the organizational injuries of Plaintiffs CENTRAL VALLEY AIR QUALITY COALITION and SOCIAL AND ENVIRONMENTAL ENTREPRENEURS, INC. The Air District's policies and procedures implementing the Equivalency System caused CVAQ to divert its resources to petition CARB to perform the CARB Audit and advocate for the District to correct the historical and cumulative Equivalency System deficits and annual Offset Equivalency Reports.

29. Defendants' violation of an emission standard or limitation has injured and continues to injure CENTRAL VALLEY AIR QUALITY COALITION and SOCIAL AND ENVIRONMENTAL ENTREPRENEURS, INC. The injunctive relief requested in this lawsuit would redress these injuries by compelling the Air District to implement the automatic remedies required by sections 7.4.1.2, 7.4.1.3, 7.4.2.1 and 7.4.2.3 of Rule 2201. The automatic remedies would require offsets for new and modified major stationary sources in compliance with federal offsets requirements, including federal offsets quantities and emission reduction credits discounted at the time of use, from the deadline for non-compliant Offset Equivalency Reports and the reporting period following Equivalency System failure. The offsets meeting federal requirements would mitigate NOx and VOC emissions from the major stationary sources subject to the automatic remedies and thus reduce ozone and PM2.5 air pollution in the San Joaquin Valley. The declaratory relief requested in this lawsuit would further redress these injuries by declaring that the Air District has a duty to comply with sections 7.2.1 and 7.2.2 of Rule 2201, has a duty to implement the automatic remedies required by sections 7.4.1.2, 7.4.1.3, 7.4.2.1 and 7.4.2.3 of Rule 2201, and has violated those duties.

30. Defendant SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT is one of thirty-five air quality management districts established under the California Health & Safety Code to develop and implement strategies for reducing emissions from stationary sources in their respective geographic regions. The District has primary authority for the control of air pollution from stationary sources. Under California law, the District has the authority to sue and be sued in the name of

the District in all actions and proceedings in all courts and tribunals of competent jurisdiction. Cal. Health & Safety Code § 40701.

31.     Defendant GOVERNING BOARD OF THE SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT is the 15-member governing body of the District that is authorized to adopt the rules and regulations for the District. Cal. Health & Safety Code §§ 40600(c), 40601, 40604.

### STATUTORY FRAMEWORK

32.     The Clean Air Act reflects a model of cooperative federalism, whereby the U.S. Environmental Protection Agency ("EPA") sets health-based National Ambient Air Quality Standards ("NAAQS" or "standards") and states develop the attainment plans to achieve those standards. *See* 42 U.S.C. §§ 7401-7515. States' attainment plans must contain enforceable emissions limitations necessary to attain the NAAQS and meet applicable requirements of the Act. 42 U.S.C. §§ 7401(a)(1), (a)(2)(A); 7502(c)(6). EPA shall approve a plan as part of the State Implementation Plan if the plan meets the minimum requirements of the Act. Upon approval as part of the State Implementation Plan, the plan becomes federal law, enforceable by EPA and citizens, and does not change unless and until EPA approves a revision to the State Implementation Plan.

33.     State Implementation Plans for nonattainment areas must include a permitting program for the construction and operation of new or modified major stationary sources that emit pollutants over a threshold amount. 42 U.S.C. § 7502(c)(5). This permit program, called federal New Source Review ("federal NSR"), requires new or modified major stationary sources to offset their emissions so that aggregate emissions decrease in a nonattainment area. 42 U.S.C. § 7503(a)(1)(A).

34.     An area that does not meet the ozone NAAQS is called a "nonattainment area."  The Act further subdivides ozone nonattainment areas into classifications of "marginal," "moderate," "serious," "severe" and "extreme" based on the severity of the ozone pollution problem. 42 U.S.C. § 7511.

35.     Federal New Source Review conditions the quantity of offsets required by federal New Source Review on the severity of the ozone air pollution problem in a nonattainment area. In a severe ozone nonattainment area, a stationary source triggers federal NSR and becomes a major stationary source when its potential to emit exceeds 25 tons per year of NOx or VOC. 42 U.S.C. § 7511a(d). That

major stationary source must provide offsets at a ratio of 1.3 pounds of offsets to every 1 pound of emissions, which ensures a net air pollution reduction in the air basin. 42 U.S.C. § 7511a(d)(2). In an extreme ozone nonattainment area, federal NSR becomes more stringent and a stationary source triggers federal NSR and becomes a major stationary source when its potential to emit exceeds 10 tons per year and must provide even more offsets at a ratio of 1.5 pounds of offsets to every 1 pound of emissions. 42 U.S.C. § 7511a(e), (e)(1).

36.     The EPA has promulgated regulations implementing federal New Source Review. 40 C.F.R. § 51.165. Once EPA designates an area as nonattainment, then the provisions of 40 C.F.R. pt. 51, Appendix S govern federal NSR in the area during the period between the date of designation as nonattainment and the date that EPA approves the area's federal NSR permit program as part of the State Implementation Plan if it meets the requirements of part D of Title I of the Clean Air Act. 40 C.F.R. § 52.24(k).

## FACTUAL BACKGROUND

### A.     The Public Health Crisis in the San Joaquin Valley.

37.     The Air District's violations of the Equivalency System have allowed unmitigated emissions of NOx and VOC from new and modified stationary sources. New and modified stationary sources such as oil production facilities, oil refineries, natural gas power plants, and industrial facilities emit NOx and VOC that contribute to ozone and PM2.5 pollution in the San Joaquin Valley.

38.     Ozone and PM2.5 air pollution in the San Joaquin Valley air basin has caused, and continues to cause, a public health crisis. According to the American Lung Association's State of the Air 2023 report, the San Joaquin Valley air basin ranks among the worst in the United States. Tulare, Kern, and Fresno are the fourth, fifth, and sixth most ozone-polluted counties in the United States, respectively. The Valley cities of Visalia, Bakersfield, and Fresno-Madera-Hanford rank as the second, third, and fourth most ozone-polluted cities, respectively. For short-term exposure to PM2.5, the Valley counties of Kern, Fresno, Kings, and Tulare rank as the first, second, fourth, and eighth most PM2.5-polluted counties, respectively. With respect to long-term exposures, Kern, Tulare, Kings, Fresno, and Stanislaus rank as the first, second, fifth, sixth, and sixteenth most PM2.5-polluted counties, respectively.

39.     Ground-level ozone is formed by a reaction between NOx and VOC in the presence of heat and sunlight. Unlike ozone in the upper atmosphere which forms naturally and protects the Earth from ultraviolet radiation, ozone at ground level forms primarily from anthropogenic pollution.

40.     Fine particulate matter ("PM2.5") is both a directly emitted pollutant and also forms secondarily in the atmosphere by the precursor pollutants NOx, ammonia, sulfur oxides, and VOC.

41.     Short-term exposure to ozone irritates lung tissue, decreases lung function, exacerbates respiratory disease such as asthma and Chronic Obstructive Pulmonary Disease (COPD), and increases susceptibility to respiratory infections such as pneumonia, all of which contribute to an increased likelihood of emergency department visits and hospitalizations. Short-term exposure to ozone also increases the risk of premature death, especially among older adults. Long-term exposure to ozone can cause permanent lung damage, stunt lung development in children, cause asthma in children, decrease lung function, damage the airways, lead to the development of COPD, and increase allergic responses.

42.     Short-term exposure to PM2.5 pollution causes premature death, decreases lung function, exacerbates respiratory disease such as asthma, and causes increased hospital admissions. Long-term exposure causes development of asthma in children, decreased lung function growth in children, increased risk of death from cardiovascular disease, and increased risk of death from heart attacks. CARB has estimated that PM2.5 exposure has caused 1,200 premature deaths annually in the San Joaquin Valley.

43.     The EPA has found that the San Joaquin Valley has failed to attain several National Ambient Air Quality Standards ("NAAQS" or "standards") by their respective deadlines. *See* 66 Fed. Reg. 56476 (Nov. 8, 2001) (1-hour ozone standard failure to attain by 1999); 67 Fed. Reg. 48039 (July 23, 2002) (PM-10 standard failure to attain by 2001); 76 Fed. Reg. 82133 (December 30, 2011) (1-hour ozone standard failure to attain by 2010); 81 Fed. Reg. 84481 (November 23, 2016) (1997 24-hour and annual PM2.5 standards failure to attain by 2015); 86 Fed. Reg. 67329 (Nov. 26, 2021) (disapproving 1997 annual PM2.5 implementation plan because of failure to attain the standard by December 31, 2020).

44.     CalEnviroScreen 4.0 ranks the San Joaquin Valley communities of Arvin, Shafter, and Delano in the top 25 percent of California Senate Bill 532 disadvantaged communities based on

CalEnviroScreen 4.0 data. CalEnviroScreen 4.0 ranks Shafter and Delano above the 95th percentile of California census tracks for exposure to PM2.5. CalEnviroScreen 4.0 ranks Arvin above the 95th percentile of census tracks for exposure to ozone. CalEnviroScreen 4.0 ranks Shafter and Delano above the 80th percentile of census tracks for exposure to ozone.

45. According to EPA's environmental justice screening and mapping tool ("EJ SCREEN"), all eight San Joaquin Valley counties score well above the national average for the Demographic Index, seven counties score above the 90th percentile for the PM2.5 Environmental Justice Index, and five counties score above the 90th percentile for the Ozone Environmental Justice Index. 87 Fed. Reg. 60494, 60527-60528 (Oct. 5, 2022). The Demographic Index is the average of an area's population of people of color and low-income residents. The PM.5 and Ozone Environmental Justice indices are an area's exposure to PM2.5 and ozone, respectively, combined with the Demographic Index.

46. EPA has designated the San Joaquin Valley as an extreme ozone nonattainment area for the 2008 8-hour ozone standard and the 2012 8-hour ozone standard. EPA has designated the San Joaquin Valley as a serious nonattainment area for the 1997 annual PM2.5 standard, the 2006 24-hour PM2.5 standard, and the 2012 annual PM2.5 standard.

47. The San Joaquin Valley has not attained the 1997, 2008, and 2012 8-hour ozone standards. EPA data show design values for 2018-2020 and 2019-2021 remaining flat at 0.93, well above the 0.84 design value necessary to attain the 1997 8-hour ozone standard.

48. The San Joaquin Valley has not attained the 1997 and 2012 annual PM2.5 standards. EPA data show design values for 2018-2020 and 2019-2021 at 17.6 and 17.8 micrograms per cubic meter ($\mu$g/m$^3$), well above the 15 $\mu$g/m$^3$ and 12 $\mu$g/m$^3$ design values necessary to attain the 1997 and 2012 annual PM2.5 standards, respectively.

**B.      Stationary Sources and District New Source Review.**

49. The Air District implements stationary source permitting requirements imposed by California law and the federal Clean Air Act, 42 U.S.C. §§ 7401, *et seq*. California law requires new and modified stationary sources to obtain approval from the Air District in the form of an Authority to Construct ("ATC") permit, install pollution control technology meeting the Best Available Control Technology ("BACT") standard, and offset the emissions from new or modified sources that occur after

implementation of BACT. The California state law permitting program is called "District New Source Review" or "District NSR."

50.     District New Source Review applies to stationary sources with emissions greater than one pound per day, and requires a source to obtain NOx and VOC offsets for the source's emissions greater than ten tons per year. The ratio of offsets to emissions required by District NSR varies from a 1:1 ratio to a 1.5:1 ratio depending on the source of offsets and the distance from the permitted source to the source of offsets. Rule 2201 § 4.8.4.

51.     Stationary sources subject to offsets must obtain and provide the offsets in the form of Emission Reduction Credits ("ERC"), the currency for offsets.

52.     To generate an Emission Reduction Credit, an emission reduction must be "creditable," which Rule 2201 defines as real, quantifiable, surplus, permanent, and enforceable. The surplus value requirement that ensures claimed emissions reductions used as Emission Reduction Credits do not represent reductions already required by law, thus assigning value only to those reductions that represent surplus reductions.

53.     District New Source Review and federal New Source Review offsets requirements apply different standards for determining the surplus value of an Emission Reduction Credit. District New Source Review determines the surplus value at the time a source generates the Emission Reduction Credit (time of issuance). Federal New Source Review determines the surplus value at the time a source uses the ERC to satisfy the offsets requirement (time of use).

54.     Offsets under federal New Source Review lose time-of-use value as pollution control measures become more stringent during the period between credit issuance and credit use. For example, a source generates a credit equal to 1 ton per year at the time of issuance, and the Air District subsequently adopts a generally applicable rule that requires adoption of a technology that achieves a 50 percent reduction in emissions. District New Source Review would continue to value that credit at 1 ton per year based on the time of issuance valuation while federal New Source Review would discount the credit's value to 0.5 tons per year based on the time of use. The surplus value difference between District New Source Review and federal New Source Review expands over time as the Air District adopts more controls and Emission Reduction Credits lose value.

### C.     The Annual Offset Equivalency Tracking System.

55.     The Air District shall implement the Annual Offset Equivalency Tracking System ("Equivalency System") – the accounting system – to ensure the Air District can implement its offset program under California law while guaranteeing San Joaquin Valley residents receive the more stringent benefits of federal offsets requirements. The Equivalency System ensures an equivalent quantity of offsets and an equivalent time-of-use surplus value of offsets to reconcile for the differences between District NSR and federal NSR.

56.     The Equivalency System tracks the following for each permitting action: (a) the quantity of offsets that would have been required for new major sources and federal major modifications in the District had the Air District applied federal New Source Review requirements; (b) the quantity of offsets actually required for all new and modified sources in the District pursuant to the requirements of Rule 2201; and (c) the surplus value of creditable emission reductions used as offsets by stationary sources. Rule 2201 §§ 7.1.1, 7.1.2, and 7.1.3.

57.     The Air District shall annually prepare each Offset Equivalency Report for the period from August 20 to August 19 and must submit the Report by November 20. Rule 2201 §§ 7.2, 7.3.1, 7.3.2.

58.     The annual Offset Equivalency Reports compare the offsets required under District New Source Review to what would otherwise have been required under federal New Source Review by applying two analytical frameworks for offset quantity and time-of-use surplus value. The EPA and the Air District have adopted the terms "Test 1" for the offset quantity analysis and "Test 2" for the time-of-use surplus value analysis.

59.     Although the Air District must submit Offset Equivalency Reports for each reporting period, the Air District must cumulatively demonstrate the equivalency of offsets required by Rule 2201 with offsets required by federal New Source Review since August 20, 2001, the date the Equivalency System's accounting commenced.

60.     Test 1 compares the total quantity of offsets that would have been required by federal New Source Review – the federal offset quantity – to the total quantity of offsets required by District New Source Review. Rule 2201 § 7.2.1.1.

61.     If Test 1 fails to demonstrate equivalency, then the District shall rely on "additional

creditable emission reductions" that have not been used as offsets and have been banked or have been generated as a result of permitting actions to make up any shortfall. Rule 2201 § 7.4.1.1.

62.     If the District lacks sufficient additional creditable emission reductions to demonstrate equivalency under Test 1, then all Authority to Construct permits issued after the report deadline for that year shall comply with federal offset requirements. Rule 2201 § 7.4.1.2.

63.     If the Air District fails to submit a report complying with Equivalency System requirements for Test 1, all Authority to Construct permits issued after the report deadline and until the Air District submits a report meeting the requirements of Test 1 shall comply with federal offset requirements. Rule 2201 § 7.4.1.3.

64.     Test 2 compares the total quantity of offsets that would have been required by federal New Source Review – the federal offset quantity – with the time-of-use surplus value of creditable emissions reductions used as offsets in District New Source Review. Rule 2201 § 7.2.2.1.

65.     Test 2 allows the Air District to use "additional creditable emissions reductions" that have not been used as offsets and have been banked or have been generated as a result of permitting actions to supplement the surplus value of the offsets required by District New Source Review. Rule 2201 § 7.2.2.2.

66.     If the District fails to demonstrate equivalency under Test 2, an automatic remedy applies so that all Authority to Construct permits issued for new major sources or federal major modifications, for each pollutant for which there is a shortfall, shall ensure that emission reductions used to satisfy offset requirements are creditable and that the time-of-use surplus value of those credits is determined at the time of Authority to Construct permit issuance. Rule 2201 § 7.4.2.1.

67.     If the Air District fails to submit a report meeting the Equivalency System requirements for Test 2, all Authority to Construct permits issued for new major stationary sources or federal major modifications after the report deadline and until the Air District submits a report complying with the Equivalency System requirements shall ensure that emission reductions used to satisfy offset requirements are creditable and that the time-of-use surplus value of those credits is determined at the time of Authority to Construct permit issuance. Rule 2201 § 7.4.2.3.

**D.    The Environmental Protection Agency has Approved the Annual Offset Equivalency Tracking System as Part of the State Implementation Plan.**

68.    Effective August 20, 2001, EPA finalized a limited approval and a limited disapproval of the August 28, 1998 version of the Equivalency System. 65 Fed. Reg. 58252 (Sept. 28, 2000); 66 Fed. Reg. 37587 (July 19, 2001). EPA found that the Equivalency System was "deficient because it [did] not include a specific and enforceable remedy for a shortfall in the annual equivalency demonstration . . . [and] the rule must be revised to contain a mandatory and enforceable remedy to cure any annual shortfall and prevent future shortfalls." 65 Fed. Reg. 58252, 58253.

69.    Effective on June 16, 2004, EPA approved the December 19, 2001 version of Rule 2201. EPA found that the Air District had cured the Equivalency System enforceability defects in the August 28, 1998 version of Rule 2201. 68 Fed. Reg. 7330 (Feb. 13, 2003); 69 Fed. Reg. 27837 (May 17, 2004).  EPA identified the December 19, 2001 version of Rule 2201 in the State Implementation Plan. 40 C.F.R. § 52.220(c)(311)(i)(B)(*1*).

70.    Effective June 10, 2010, EPA approved the December 18, 2008 version of Rule 2201 which amended Rule 2201 to conform the rule with the federal New Source Review threshold and offset ratio for an extreme ozone nonattainment area. 75 Fed. Reg. 4745 (Jan. 29, 2010); 75 Fed. Reg. 26102 (May 11, 2010). EPA identified the December 18, 2008 version of Rule 2201 in the State Implementation Plan. 40 C.F.R. § 52.220(c)(363)(i)(A)(*5*).

71.    Effective October 17, 2014, EPA approved the April 21, 2011 version of Rule 2201. 76 Fed. Reg. 76112 (Dec. 6, 2011); 79 Fed. Reg. 55637 (Sept. 17, 2014). EPA identified the April 21, 2011 version of Rule 2201 in the State Implementation Plan. 40 C.F.R. § 52.220(c)(400)(i)(A)(*1*). The April 21, 2011 version of Rule 2201 is the most recent-EPA approved Rule 2201 version in the State Implementation Plan.

**E.    Reclassification of the San Joaquin Valley to an Extreme Ozone Nonattainment Area.**

72.    Even though the EPA reclassified the San Joaquin Valley to an extreme nonattainment area for ozone on May 17, 2004, the District did not apply federal New Source Review extreme area permitting thresholds and extreme area offset ratios in Test 1 and Test 2 until June 10, 2010. The District also failed to apply the extreme area offset ratios in Test 1 and Test 2 from the Offset Equivalency

Report for the 2010-2011, 2011-2012, 2012-2013, and 2013-2014 reporting periods. These policies and procedures suppressed the federal offsets quantities in Test 1 and Test 2, allowing the Air District to demonstrate equivalency more easily.

73.     Effective May 17, 2004, EPA reclassified the San Joaquin Valley as an extreme ozone nonattainment area for the 1-hour ozone standard. 69 Fed. Reg. 20550 (April 16, 2004). EPA provided one year for the Air District to amend and submit Rule 2201 to conform the rule with the federal New Source Review threshold and offset ratio for an extreme ozone nonattainment area as required by 42 U.S.C. § 7511a(e), (e)(1). *Id*. at 20552.

74.     Effective June 15, 2004, EPA designated the San Joaquin Valley as a serious nonattainment area for the 1997 8-hour ozone standard. 69 Fed. Reg. 23858, 23888-23889 (April 30, 2004).

75.     Effective June 15, 2004, federal NSR permitting continued as required by the 1-hour standard if the area's nonattainment classification under the 1-hour standard was higher than the area's classification under the 1997 8-hour ozone standard. 70 Fed. Reg. 71612, 71682-71683 (Nov. 29, 2005). As an extreme ozone nonattainment area under the 1-hour ozone standard, federal NSR permitting in the San Joaquin Valley continued under the 1-hour standard because the serious nonattainment classification for the 1997 8-hour standard was lower than the extreme area classification for the 1-hour standard.

76.     Effective June 15, 2005, EPA revoked the 1-hour ozone standard and federal New Source Review requirements based on the 1-hour standard as part of the implementation of the 1997 8-hour ozone standard. 69 Fed. Reg. 23951, 23954 (April 30, 2004).

77.     Effective January 30, 2006, EPA amended 40 C.F.R. § 52.24(k) and 40 C.F.R. pt. 51, Appendix S to include extreme area permitting thresholds and offset requirements. 70 Fed. Reg. 71612, 71677 (Nov. 29, 2005).

78.     On August 29, 2007, the D.C. Circuit Court of Appeals entered the mandate and vacated EPA's revocation of federal New Source Review based on the 1-hour ozone standard. *South Coast Air Quality Management Dist. v. U.S. E.P.A.*, 422 F.3d 882 (D.C. Cir. 2006,) clarified on rehearing by *South Coast Air Quality Management Dist. v. U.S. E.P.A.*, 489 F.3d 1245 (D.C. Cir. 2007), cert. denied by *National Petrochemical & Refiners Ass'n v. South Coast Air Quality Management Dist.*, 552 U.S. 1140 (Jan. 18, 2008).

79.     On December 18, 2008, the Air District adopted amendments to conform Rule 2201 with federal New Source Review thresholds and offset ratios for an extreme ozone nonattainment area under the 1-hour ozone standard and the 1997 8-hour ozone standard. Resolution 08-12-16 made the amendments effective upon EPA approval of the amendments. The staff report accompanying the amendments discussed the difficulty of demonstrating equivalency with the reclassification as an extreme ozone nonattainment area and that NOx was the pollutant most likely to fail equivalency.

80.     Effective June 4, 2010, EPA granted California's request to reclassify the San Joaquin Valley to an extreme ozone nonattainment area for the 1997 8-hour ozone standard. 75 Fed. Reg. 24409 (May 5, 2010). In that rulemaking, EPA interpreted the applicability of federal NSR and clarified that the reclassification to extreme nonattainment marked no change for federal NSR because of the San Joaquin Valley's classification as an extreme nonattainment area for the 1-hour ozone standard. 74 Fed. Reg. 43654, 43658 (Aug. 27, 2008); 75 Fed. Reg. 24409, 24414 (May 5, 2010).

81.     Extreme area permit thresholds and offset ratios applied in the San Joaquin Valley after May 17, 2004 when EPA reclassified the San Joaquin Valley as an extreme area for the 1-hour ozone standard. In the alternative, extreme area permit thresholds and offset ratios applied after May 17, 2004, except between June 15, 2005 when EPA revoked federal New Source Review requirements for the 1-hour ozone standard and August 29, 2007 when the D.C. Circuit Court of Appeals entered the mandate vacating that revocation. The Air District delayed extreme area permit thresholds and offset ratios until June 10, 2010, which suppressed the federal offset quantity in Test 1 and Test 2 of Offset Equivalency Reports for the reporting periods 2003-2004, 2004-2005, 2005-2006, 2006-2007, 2007-2008, 2008-2009, and 2009-2010.

F.     **The Review of the San Joaquin Valley Air Pollution Control District Emission Reduction Credit System.**

82.     The Review of the San Joaquin Valley Air Pollution Control District Emission Reduction Credit System ("CARB Audit"), an audit prepared by the Enforcement Division of the California Air Resources Board, exposed the Air District's improper implementation of the Equivalency System. Following the CARB Audit, the Air District admitted that the Equivalency System no longer demonstrated equivalency for NOx and VOC for Test 1 and Test 2. The CARB Audit is attached as Exhibit 2.

83.     On January 9, 2019, several environmental justice and air quality advocacy organizations, including the Central Valley Air Quality Coalition, petitioned the California Air Resources Board to perform an audit of the Air District's Emission Reduction Credits.

84.     On January 24, 2019, CARB responded to the petition and directed staff to review the Air District's NOx and VOC Emission Reduction Credits and the Equivalency System.

85.     On June 26, 2020, CARB adopted Resolution 20-11 following a public hearing in which the Board considered and approved the findings in CARB Audit. The CARB Audit evaluated the validity of Emission Reduction Credits used for compliance with District New Source Review. The CARB Audit evaluated the Equivalency System using the most current Offset Equivalency Report for the 2018-2019 reporting period. The CARB Audit found the Air District had relied on highly questionable emissions reductions from an agricultural internal combustion engine incentive program and reductions from "orphan shutdowns" to claim equivalency. CARB Resolution 20-11 declared the CARB Audit's findings well supported and the Board adopted those findings.

86.     According to the CARB Audit, the Air District claimed 1,210.7 tons per year of NOx and 61.2 tons per year of VOC as additional creditable emission reductions from 919 agricultural internal combustion engines (AG-ICE) electrification projects. The District claimed these credits from the replacement of diesel-powered agricultural engines, used for pumping irrigation water, with electric pumps. The District claimed the AG-ICE reductions as additional creditable emission reductions in 2008, the same year that District staff warned of an extreme reclassification's consequences to the Equivalency System and the potential equivalency failure for NOx.

87.     The CARB Audit found that a sample of 10 AG-ICE projects were representative of all 919 projects and found that the AG-ICE reductions were not creditable because (a) the reductions were not generated as a result of a permitting action as required by Rule 2201 § 7.2.2.2; (b) the reductions were not creditable under Health & Safety Code § 44281(b) for projects receiving support from the Carl Moyer incentive program; and (c) the reductions were not permanent. The CARB Audit further found that the reductions were not real because the District overstated the claimed reductions by 35 percent or more using an incorrect engine load factor, or the amount of time the engines were operating. CARB Audit at 47-55.

88.     The Air District's decision to claim the non-creditable 1,210.7 tons per year of NOx AG-ICE reductions provided the majority of reductions the Air District used to improperly claim it had demonstrated NOx Test 2 equivalency. Between 2008 and the end of the 2017-2018 reporting period, the District applied all AG-ICE reductions in Test 2, which represented approximately 58 percent of the total NOx additional creditable emission reductions the District applied in Test 2 through the 2017-2018 reporting period and approximately 77 percent of the NOx additional creditable emission reductions the District applied in Test 2 between 2008 and 2018. CARB Audit at 48.

89.     The CARB Audit also evaluated so-called "orphan shutdowns" as actions generating reductions the Air District claimed to support its equivalency reports. The CARB Audit defines orphan shutdowns as "unclaimed emission reductions from facilities that have shut down and surrendered their air permits, but did not claim the actual emission reductions, if any, from the cessation of emissions" as Emission Reductions Credits. CARB Audit at 55.

90.     The CARB Audit found that a sample of 11 orphan shutdowns showed discrepancies, including orphan shutdown 2011S-9990046-4884, for which the District claimed 525.8 tons per year of VOC reductions as additional creditable emission reductions in 2011. CARB staff found that the actual emissions for this facility were zero in 2001 and ineligible for credit. At most, CARB found that the District could have claimed 25 tons per year of VOC when the facility's Title V operating permit capped VOC emissions at 50 tons per year.

91.     The CARB Audit found that in the Offset Equivalency Reports for the 2010-2011 reporting period through the 2017-2018 reporting period, the District applied 320.7 tons per year of VOC from orphan shutdown 2011-S-9990046-4884 as additional creditable emission reductions in Test 2 and carried forward 205.7 tons per year of VOC. These 320.7 tons per year of VOC equate to an amount equivalent to the pollution emitted by 32 major stationary sources of VOC, respectively, based on the 10 tons per year major stationary source threshold for an extreme ozone nonattainment area.

### G.     Annual Offset Equivalency Reports.

92.     On November 18, 2004, the District submitted the Offset Equivalency Report for the reporting period 2003-2004 to EPA.

93.     On November 18, 2005, the District submitted the Offset Equivalency Report for the

reporting period 2004-2005 to EPA.

94.     On November 17, 2006, the District submitted the Offset Equivalency Report for the reporting period 2005-2006 to EPA.

95.     On November 19, 2007, the District submitted the Offset Equivalency Report for the reporting period 2006-2007 to EPA.

96.     On November 19, 2008, the District submitted the Offset Equivalency Report for the reporting period 2007-2008 to EPA.

97.     On November 19, 2009, the District submitted the Offset Equivalency Report for the reporting period 2008-2009 to EPA.

98.     On November 18, 2010, the District submitted the Offset Equivalency Report for the reporting period 2009-2010 to EPA.

99.     On November 17, 2011, the District submitted the Offset Equivalency Report for the reporting period 2010-2011 to EPA.

100.     On November 14, 2012, the District submitted the Offset Equivalency Report for the reporting period 2011-2012 to EPA.

101.     On November 6, 2013, the District submitted the Offset Equivalency Report for the reporting period 2012-2013 to EPA.

102.     On November 17, 2014, the District submitted the Offset Equivalency Report for the reporting period 2013-2014 to EPA.

103.     On November 17, 2015, the District submitted the Offset Equivalency Report for the reporting period 2014-2015 to EPA. On January 13, 2016, the District amended and resubmitted the Offset Equivalency Report for the reporting period 2014-2015 to EPA.

104.     On November 18, 2016, the District submitted the Offset Equivalency Report for the reporting period 2015-2016 to EPA.

105.     On November 17, 2017, the District submitted the Offset Equivalency Report for the reporting period 2016-2017 to EPA.

106.     On November 16, 2018, the District submitted the Offset Equivalency Report for the reporting period 2017-2018 to EPA.

107.    On November 18, 2019, the District submitted the Offset Equivalency Report for the reporting period 2018-2019 to EPA. The Report is attached as Exhibit 3. The Report claimed equivalency with Test 1 and claimed an excess balance of 4,313.9 and 707.2 tons per day of NOx and VOC, respectively. The Report claimed equivalency with Test 2 and claimed unused carry-over creditable reductions of 408 and 1,428 tons per day of NOx and VOC, respectively.

108.    On September 17, 2020, the Governing Board adopted a motion to authorize the Executive Director/APCO of the District to provisionally withdraw all additional creditable emission reductions derived from all AG-ICE agricultural irrigation engine electrification projects and all orphan shutdowns. The Staff Report recommending the provisional withdrawal stated the "findings of CARB's review point to the need to revisit the assumptions used in the District's equivalency demonstrations for the [Test 2] surplus value test . . . [and] CARB raised valid questions regarding the assumptions, quantification methodologies, and creditability of the emission reductions associated" with the AG-ICE program and orphan shutdown reductions.

109.    On November 20, 2020, the District submitted the Offset Equivalency Report for the reporting period 2019-2020 to EPA. On January 5, 2021, the District submitted an errata disclosure for the Offset Equivalency Report for the reporting period 2019-2020. The Report and the errata disclosure are attached as Exhibit 4.

110.    For Test 1, the Offset Equivalency Report for the 2019-2020 reporting period disclosed a Test 1 equivalency failure for VOC and reported a VOC year-end carryover shortfall of 2,128.4 tons per year. The shortfall resulted from the Air District adjusting the VOC balance by subtracting 2,820.6 tons per year due to changes it made to Test 1 following the CARB Audit. The Air District adjusted the Test 1 NOx balance by subtracting 3,968.8 tons per year due to changes it made to Test 1 following the CARB Audit and disclosed a NOx year-end carryover excess of 353.1 tons per year.

111.    For Test 2, the Offset Equivalency Report for the 2019-2020 reporting period conceded equivalency failure for NOx and VOC, did not disclose any data for those pollutants, and stated "[e]ffective September 17, 2020, NOx and VOC were no longer Surplus Value equivalent and Rule 2201 remedy was enacted to require surplus at time-of-use ERCs for projects requiring NOx and VOC offsets under Rule 2201." The Air District made negative adjustments to Test 2 following the CARB Audit by

amounts greater than the unused carryover reductions from the 2018-2019 report of 408 and 1,428 tons per year of NOx and VOC, respectively.

112.    On November 19, 2021, the District submitted the Offset Equivalency Report for the reporting period 2020-2021 to EPA. On March 1, 2022, the District amended and resubmitted the Offset Equivalency Report for the reporting period 2020-2021. The amended and resubmitted Report is attached as Exhibit 5.

113.    The Offset Equivalency Report for the reporting period 2020-2021 omits all data for VOC and NOx from both Test 1 and Test 2, and concedes Test 1 and Test 2 equivalency failure for NOx and VOC. The Air District made an undisclosed negative adjustment to the Test 1 NOx balance by an amount greater than 353.1 tons per year, the year-end carryover excess from 2019-2020.

114.    On November 16, 2022, the District submitted the Offset Equivalency Report for the reporting period 2021-2022 to EPA. The Report is attached as Exhibit 6. The Offset Equivalency Report for the reporting period 2021-2022 omits data for VOC and NOx in both Test 1 and Test 2, and concedes Test 1 and Test 2 equivalency failure for NOx and VOC.

115.    The negative adjustments the Air District made to Test 1 data reflect offsets the Air District failed to require from stationary sources prior to the 2019-2020 reporting period. The negative adjustments equate to a cumulative offsets deficit of at least 4,321.9 and 2,820.6 tons per year of NOx and VOC, respectively. The negative adjustments equate to at least an amount equivalent to the offsets required for hundreds of major stationary sources of NOx and VOC, respectively, based on the 10 tons per year major stationary source threshold for an extreme ozone nonattainment area.

116.    The negative adjustments the Air District made to Test 2 data reflect the time-of-use surplus value deficit and unmitigated air pollution the Air District allowed in the San Joaquin Valley in excess of federal New Source Review offset requirements. The negative adjustments total at least 408 and 1,428 tons per year of NOx and VOC, respectively. These deficits equate to an amount equivalent to the pollution emitted by at least 40 and 142 major stationary sources of NOx and VOC, respectively, based on the 10 tons per year major stationary source threshold for an extreme ozone nonattainment area.

117.    The Air District has denied San Joaquin Valley residents, including members of Environmental Justice Organizations, the benefits of offsets as required by the Clean Air Act when the Air

District allowed new and modified sources of air pollution to emit unmitigated NOx and VOC emissions by failing to correct annual Offset Equivalency Reports and failing to implement the automatic remedies for equivalency failure.

**H.    The ERC Public Advisory Workgroup.**

118.    On June 26, 2020, during the CARB Board hearing on the CARB Audit, the Executive Officer/APCO for the Air District committed to assemble a public advisory working group "to assist in developing solutions related to the Air District's offset equivalency system."

119.    For the next two years, the Air District ran the ERC Public Advisory Workgroup as a body to solve the lack of additional creditable emission reductions needed to demonstrate equivalency while refusing to reconcile the historical and cumulative deficits in the Equivalency System.

120.    On July 14, 2022, Dr. Catherine Garoupa, Executive Director of the Central Valley Air Quality Coalition, and the other two public interest members of the ERC Public Advisory Workgroup resigned because of the Air District's failure to hold itself accountable.

**FIRST CLAIM FOR RELIEF**

**Violation of an Emission Standard or Limitation:**

**Offset Equivalency Reports Rely on AG-ICE and Orphan Shutdown Reductions to Claim Test 2**

**Equivalency for NOx and VOC**

**(42 U.S.C. § 7604(a)(1))**

121.    Environmental Justice Organizations re-allege and incorporate by reference the allegations set forth in the above paragraphs.

122.    Section 7.2.2.1 of Rule 2201 requires that the annual Offset Equivalency Report "shall include a comparison of the annual quantity of federal offsets that would have been required (as tracked pursuant to Section 7.1.1) to the surplus value of creditable emission reductions used as offsets during the year (as tracked pursuant to Section 7.1.3)."

123.    Section 7.2.2.2 of Rule 2201 authorizes for "purposes of the demonstration described in Section 7.2.2, the comparison may also include the surplus value of additional creditable emission reductions that have not been used as offsets and have been banked or have been generated as a result of permitting actions."

124.     Section 7 of Rule 2201 is an emission standard or limitation. EPA approved section 7 of Rule 2201 as part of the State Implementation Plan. 40 C.F.R. § 52.220(c)(311)(i)(B)(*1*); 40 C.F.R. § 52.220(c)(363)(i)(A)(*5*); 40 C.F.R. § 52.220(c)(400)(i)(A)(*1*).

125.     The Test 2 demonstrations in the Offset Equivalency Reports for the reporting periods 2007-2008, 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-2017, 2017-2018, and 2018-2019 rely on reductions from AG-ICE agricultural irrigation engine electrification projects claimed as additional creditable emission reductions pursuant to section 7.2.2.2 of Rule 2201.

126.     The Test 2 demonstrations in the Offset Equivalency Reports for the reporting periods 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-2017, 2017-2018, and 2018-2019 rely on reductions from orphan shutdown 2011-S-9990046-4884 claimed as additional creditable emission reductions pursuant to section 7.2.2.2 of Rule 2201.

127.     The reductions from AG-ICE agricultural irrigation engine electrification projects and orphan shutdown 2011-S-9990046-4884 are not creditable within the meaning of section 7.1.5 of Rule 2201.

128.     On September 17, 2020, the District provisionally withdrew all reductions it had claimed from all AG-ICE agricultural irrigation engine electrification projects and all orphan shutdowns from the Equivalency System.

129.     The Offset Equivalency Report Test 2 demonstrations for reporting periods 2007-2008, 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-2017, 2017-2018, and 2018-2019 violate section 7.2.2 of Rule 2201 by relying on reductions from AG-ICE agricultural irrigation engine electrification projects and orphan shutdowns that are non-creditable and which the District has provisionally withdrawn from the Equivalency System. The District has not amended and submitted corrected Offset Equivalency Reports for reporting periods 2007-2008, 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-2017, 2017-2018, and 2018-2019 to account for the withdrawn reductions from AG-ICE electrification projects and orphan shutdowns.

130.     By adopting and submitting annual Offset Equivalency Reports that rely on non-creditable

and withdrawn reductions from AG-ICE electrification projects and orphan shutdowns, Defendants have violated and continue to violate an emission standard or limitation within the meaning of the Clean Air Act's citizen suit provision. 42 U.S.C. § 7604(a)(1). Defendants' violation of the Clean Air Act is ongoing and will continue unless remedied by this Court.

**SECOND CLAIM FOR RELIEF**

**Violation of an Emission Standard or Limitation:**

**Offset Equivalency Reports Use the Federal Offset Quantity for a Severe Ozone Nonattainment Area to Claim Test 1 and Test 2 Equivalency for NOx and VOC**

**(42 U.S.C. § 7604(a)(1))**

131.    Environmental Justice Organizations re-allege and incorporate by reference the allegations set forth in the above paragraphs.

132.    Section 7.2.1.1 of Rule 2201 requires that the annual Offset Equivalency Report "shall include a comparison of the annual quantity of federal offsets that would have been required (as tracked pursuant to Section 7.1.1) to the annual quantity of offsets actually required under this rule, including any excess offsets required from previous reporting years (as tracked pursuant to Section 7.1.2)."

133.    Section 7.2.2.1 of Rule 2201 requires that the annual Offset Equivalency Report "shall include a comparison of the annual quantity of federal offsets that would have been required (as tracked pursuant to Section 7.1.1) to the surplus value of creditable emission reductions used as offsets during the year (as tracked pursuant to Section 7.1.3)."

134.    Section 7 of Rule 2201 is an emission standard or limitation. EPA approved section 7 of Rule 2201 as part of the State Implementation Plan. 40 C.F.R. § 52.220(c)(311)(i)(B)(*1*); 40 C.F.R. § 52.220(c)(363)(i)(A)(*5*); 40 C.F.R. § 52.220(c)(400)(i)(A)(*1*).

135.    Effective May 17, 2004, EPA reclassified the San Joaquin Valley as an extreme ozone nonattainment area for the 1-hour ozone standard. 69 Fed. Reg. 20550 (April 16, 2004). Extreme area major source thresholds and offset ratios applied to the San Joaquin Valley after May 17, 2004, the date of designation as an extreme area. In the alternative, extreme area permit thresholds and offset ratios applied after May 17, 2004, except between June 15, 2005 when EPA revoked federal New Source Review for the 1-hour ozone standard and August 29, 2007 when the D.C. Circuit Court of Appeals entered the mandate

vacating that revocation.

136.    The District did not amend Rule 2201 to apply extreme area major source thresholds and offset ratios until June 10, 2010, the effective date of EPA's approval of the December 18, 2008 version of Rule 2201.

137.    The Offset Equivalency Report for the period 2019-2020 admitted that the District failed to apply the extreme area offset ratio for tracked federal projects during the reporting periods 2010-2011, 2011-2012, 2012-2013, and 2013-2014. "The District determined that an adjustment was necessary to correct an issue affecting NOx and VOC for tracked federal projects during the period starting August 20, 2010, and ending August 19, 2014. Specifically, the appropriate extreme non-attainment federal offset ratio of 1.5 to 1 for NOx and VOC was not applied during this period." 2019-2020 Offset Equivalency Report at 10. By failing to apply the extreme area offset ratio, the Air District has submitted four annual Offset Equivalency Reports with lower Federal Offset Quantities in Test 1 and Test 2 than that which the Air District should have applied. This also affected Test 2 by requiring less additional creditable emission reductions to compensate for shortfalls because the Air District applied lower, incorrect Federal Offset Quantities.

138.    The Test 1 and Test 2 demonstrations for the Offset Equivalency Reports for the reporting periods 2003-2004, 2004-2005, 2005-2006, 2006-2007, 2007-2008, 2008-2009, and 2009-2010 violate sections 7.2.1 and 7.2.2 of Rule 2201 by including Federal Offset Quantities based on the major source permitting thresholds and offset ratios for a severe ozone nonattainment area (1.2 to 1) instead of the permitting thresholds and offset ratios for an extreme ozone nonattainment area (1.5 to 1). As a result, the Federal Offset Quantities were less than required by sections 7.2.1 and 7.2.2 of Rule 2201 and the Air District more easily demonstrated equivalency.

139.    The Test 1 and Test 2 demonstrations for the Offset Equivalency Reports for the reporting periods 2010-2011, 2011-2012, 2012-2013, and 2013-2014 violate sections 7.2.1 and 7.2.2 of Rule 2201 by including Federal Offset Quantities based on offset ratios for a severe ozone nonattainment area (1.2 to 1) instead of the offset ratios for an extreme ozone nonattainment area (1.5 to 1). As a result, the Federal Offset Quantities were less than required by sections 7.2.1 and 7.2.2 of Rule 2201 and the Air District more easily demonstrated equivalency.

140.     The erroneous Federal Offset Quantities applied in the Offset Equivalency Reports for the reporting periods 2003-2004, 2004-2005, 2005-2006, 2006-2007, 2007-2008, 2008-2009, 2009-2010, 2011-2012, 2012-2013, and 2013-2014 have a cumulative effect during those reporting periods and future reporting periods.

141.     By adopting and submitting annual Offset Equivalency Reports that applied severe ozone nonattainment area major source thresholds and offset ratios instead of extreme area major source thresholds and offset ratios, the District understated the Federal Offset Quantity in Test 1 and Test 2 in the Offset Equivalency Reports for the reporting periods 2003-2004, 2004-2005, 2005-2006, 2006-2007, 2007-2008, 2008-2009, 2009-2010, 2011-2012, 2012-2013, and 2013-2014. Defendants have thus violated and continue to violate an emission standard or limitation within the meaning of the Clean Air Act's citizen suit provision. 42 U.S.C. § 7604(a)(1). Defendants' violation of the Clean Air Act is ongoing and will continue unless remedied by this Court.

### THIRD CLAIM FOR RELIEF

### Violation of an Emission Standard or Limitation:

### Offset Equivalency Reports Fail to Disclose Test 1 and Test 2 Data

### (42 U.S.C. § 7604(a)(1))

142.     Environmental Justice Organizations re-allege and incorporate by reference the allegations set forth in the above paragraphs.

143.     The Offset Equivalency Report for the reporting period 2019-2020 failed to compare the "annual quantity of federal offsets that would have been required (as tracked pursuant to Section 7.1.1) to the surplus value of creditable emission reductions used as offsets during the year (as tracked pursuant to Section 7.1.3)" for NOx and VOC.

144.     The Offset Equivalency Report for the reporting period 2020-2021 failed to compare the "annual quantity of federal offsets that would have been required (as tracked pursuant to Section 7.1.1) to the annual quantity of offsets actually required under this rule, including any excess offsets required from previous reporting years (as tracked pursuant to Section 7.1.2)" for NOx and VOC.

145.     The Offset Equivalency Report for the reporting period 2020-2021 failed to compare the "annual quantity of federal offsets that would have been required (as tracked pursuant to Section 7.1.1) to

the surplus value of creditable emission reductions used as offsets during the year (as tracked pursuant to Section 7.1.3)" for NOx and VOC.

146.    The Offset Equivalency Report for the reporting period 2021-2022 failed to compare the annual quantity of federal offsets that would have been required (as tracked pursuant to Section 7.1.1) to the annual quantity of offsets actually required under this rule, including any excess offsets required from previous reporting years (as tracked pursuant to Section 7.1.2)" for NOx and VOC.

147.    The Offset Equivalency Report for the reporting period 2021-2022 failed to compare the "annual quantity of federal offsets that would have been required (as tracked pursuant to Section 7.1.1) to the surplus value of creditable emission reductions used as offsets during the year (as tracked pursuant to Section 7.1.3)" for NOx and VOC.

148.    Rather than disclose data for NOx and VOC required by sections 7.2.1 and 7.2.2 of Rule 2201 in Offset Equivalency Reports for the reporting periods 2019-2020, 2020-2021, and 2021-2022, the Air District omitted the data and conceded equivalency failure.

149.    By failing to disclose data for NOx and VOC required by sections 7.2.1 and 7.2.2 of Rule 2201 in Offset Equivalency Reports for the reporting periods 2019-2020, 2020-2021, and 2021-2022, the Air District has violated and continues to violate an emission standard or limitation within the meaning of the Clean Air Act's citizen suit provision. 42 U.S.C. § 7604(a)(1). Defendants' violation of the Clean Air Act is ongoing and will continue unless remedied by this Court.

**FOURTH CLAIM FOR RELIEF**

**Violation of an Emission Standard or Limitation:**

**Failure to Implement Automatic Remedies for Submitting Offset Equivalency Reports that Violate**

**Sections 7.2.1 and 7.2.2 of Rule 2201**

**(42 U.S.C. § 7604(a)(1))**

150.    Environmental Justice Organizations re-allege and incorporate by reference the allegations set forth in the above paragraphs.

151.    Section 7.4.1.3 of Rule 2201 requires that if "the APCO fails to submit a report meeting the requirements of Section 7.2.1, all ATC issued after the report deadline and until the APCO submits to ARB, EPA and the public a report complying with the requirements of Section 7.2.1 shall comply with the

offset requirements of 40 CFR 51.165, and part D of Title I of the CAA."

152.    Section 7.4.2.3 of Rule 2201 requires that if "the APCO fails to submit a report meeting the requirements of Section 7.2.2, all ATCs issued for new major sources or federal major modifications after the report deadline and until the APCO submits to ARB, EPA and the public a report complying with the requirements of Section 7.2.1 shall ensure that emission reductions used to satisfy offset requirements are creditable and that the surplus value of those credits is determined at the time of ATC issuance."

153.    The Air District has failed to submit compliant Offset Equivalency Reports for reporting periods 2007-2008, 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-2017, 2017-2018, and 2018-2019 for the Test 1 and Test 2 equivalency demonstrations to account for the non-creditable reductions from the AG-ICE agricultural irrigation engine electrification projects and orphan shutdown 2011-S-9990046-4884 and the provisional withdrawal of all reductions from all AG-ICE agricultural irrigation engine electrification projects and all orphan shutdowns, as alleged in the First Claim for Relief.

154.    The Air District has failed to submit compliant Offset Equivalency Reports for reporting periods 2003-2004, 2004-2005, 2005-2006, 2006-2007, 2007-2008, 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-2017, 2017-2018, and 2018-2019 for the Test 1 and Test 2 equivalency demonstrations to account for incorrect Federal Offset Quantities, as alleged in the Second Claim for Relief.

155.    The Air District has failed to submit compliant Offset Equivalency Reports for reporting periods 2019-2020, 2020-2021, and 2021-2022 for the Test 1 and Test 2 equivalency demonstrations to account for the NOx and VOC data omitted, as alleged in the Third Claim for Relief.

156.    The Air District has failed to implement automatic remedies for non-compliant Offset Equivalency Reports as required by sections 7.4.1.3 and 7.4.2.3 of Rule 2201.

157.    By failing to implement automatic remedies as required by sections 7.4.1.3 and 7.4.2.3 of Rule 2201 because of noncompliant Offset Equivalency Reports for the reporting periods 2003-2004, 2004-2005, 2005-2006, 2006-2007, 2007-2008, 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-2017, 2017-2018, 2018-2019, 2019-2020, 2020-2021, and 2021-2022, Defendants have violated and continue to violate an emission standard or limitation within the

meaning of the Clean Air Act's citizen suit provision. 42 U.S.C. § 7604(a)(1). Defendants' violation of the Clean Air Act is ongoing and will continue unless remedied by this Court.

### FIFTH CLAIM FOR RELIEF

### Violation of an Emission Standard or Limitation:

### Failure to Implement Automatic Remedies upon Equivalency Failure

### (42 U.S.C. § 7604(a)(1))

158.    Environmental Justice Organizations re-allege and incorporate by reference the allegations set forth in the above paragraphs.

159.    If the Air District fails to demonstrate equivalency pursuant to Test 1, the district may use additional creditable emission reductions to correct the shortfall. If the District cannot correct the shortfall, the District shall implement the automatic remedies required by section 7.4.1.2 of Rule 2201.

160.    If the Air District fails to demonstrate equivalency pursuant to Test 2, the District shall implement the automatic remedies required by section 7.4.2.1 of Rule 2201.

161.    The Offset Equivalency Reports for the reporting periods 2019-2020, 2020-2021, and 2021-2022 concede Test 1 and Test 2 equivalency failure for NOx and VOC.

162.    The Air District has failed to submit amended Offset Equivalency Reports for reporting periods 2003-2004, 2004-2005, 2005-2006, 2006-2007, 2007-2008, 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-2017, 2017-2018, and 2018-2019 as alleged in the Fourth Claim for Relief.

163.    Based upon information and belief, and upon information in the public record including the CARB Audit, the annual Offset Equivalency Reports, and the Air District's provisional withdrawal of all reductions from AG-ICE agricultural irrigation engine electrification projects and orphan shutdowns from the Equivalency System, Environmental Justice Organizations allege that the Air District has failed to demonstrate equivalency pursuant to Test 1 and Test 2 during reporting periods prior to the 2019-2020 reporting period. The data showing the precise reporting period or periods in which the District has failed to demonstrate Test 1 and Test 2 equivalency are within the exclusive possession and control of the District.

164.    The District has failed to implement the automatic remedies required by sections 7.4.1.2

and 7.4.2.1 of Rule 2201 during reporting periods prior to the 2019-2020 reporting period.

165.    By failing to implement the automatic remedies required for Test 1 and Test 2 equivalency failure prior to the 2019-2020 reporting period, the Air District has violated and continues to violate an emission standard or limitation within the meaning of the Clean Air Act's citizen suit provision. 42 U.S.C. § 7604(a)(1). Defendants' violation of the Clean Air Act is ongoing and will continue unless remedied by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court grant the following relief:

A.    DECLARE that the Defendants have adopted and submitted Offset Equivalency Reports for the reporting periods 2003-2004, 2004-2005, 2005-2006, 2006-2007, 2007-2008, 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-2017, 2017-2018, 2018-2019, 2019-2020, 2020-2021, and 2021-2022 that violate sections 7.2.1 and 7.2.2 of Rule 2201.

B.    DECLARE that the Defendants have a duty to implement automatic remedies until Defendants have submitted corrected Offset Equivalency Reports for the reporting periods 2003-2004, 2004-2005, 2005-2006, 2006-2007, 2007-2008, 2008-2009, 2009-2010, 2010-2011, 2011-2012, 2012-2013, 2013-2014, 2014-2015, 2015-2016, 2016-2017, 2017-2018, 2018-2019, 2019-2020, 2020-2021, and 2021-2022 and have violated an emission standard or limitation by failing to implement automatic remedies.

C.    DECLARE that the Defendants have a duty to implement automatic remedies for Test 1 and Test 2 equivalency failure during reporting periods prior to the 2019-2020 reporting period and have violated an emission standard or limitation by failing to implement automatic remedies during those reporting periods.

D.    ISSUE preliminary and permanent injunctions directing the Defendants to correct and submit amended Offset Equivalency Reports to the California Air Resources Board, the U.S. Environmental Protection Agency, and the public;

E.    ISSUE preliminary and permanent injunctions directing the Defendants to implement automatic remedies required by sections 7.4.1.2, 7.4.1.3, 7.4.2.1 and 7.4.2.3 of Rule 2201;

F.      RETAIN jurisdiction over this matter until such time as the Defendants have complied with their duty under the Clean Air Act;

G.      AWARD to Plaintiffs their costs of litigation, including reasonable attorney and expert witness fees; and

H.      GRANT such additional relief as the Court may deem just and proper.

Dated:  May 24, 2023                    Respectfully Submitted,

                                        LAW OFFICES OF BRENT J. NEWELL

                                        /s/ Brent Newell
                                        Brent J. Newell
                                        Attorney for Plaintiffs


                                        LOZEAU DRURY, LLP

                                        /s/ Richard T. Drury
                                        Richard T. Drury
                                        Victoria Yundt
                                        Attorneys for Plaintiffs


                                        CENTER ON RACE, POVERTY & THE ENVIRONMENT

                                        /s/ Grecia Orozco
                                        Grecia Orozco
                                        Attorney for Plaintiff