*Fee Exempt Per Gov. Code § 6103*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOODRUFF & SMART, APC
BRADLEY R. HOGIN - State Bar No. 140372
bhogin@woodruff.law
RICIA R. HAGER - State Bar No. 234052
rhager@woodruff.law
555 Anton Boulevard, Suite 1200
Costa Mesa, California 92626-7670
Telephone:  (714) 558-7000

ANNETTE A. BALLATORE, State Bar No. 192176
Annette.ballatore@valleyair.org
ISELA G. WELZ, State Bar No. #337658
Isela.welz@valleyair.org
SAN JOAQUIN VALLEY UNIFIED AIR
POLLUTION CONTROL DISTRICT
1990 E. Gettysburg Avenue
Fresno, California 93726
Telephone: (559) 230-6034

PHILIP M. JAY, (State Bar No. 86174)
pjay@kschanford.com
KAHN, SOARES & CONWAY, LLP
219 N. Douty Street
Hanford, California 93230
Telephone: (559) 584-3337

Attorneys for Defendants SAN JOAQUIN VALLEY UNIFIED AIR
POLLUTION CONTROL DISTRICT, and the GOVERNING BOARD OF THE
SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT,

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY AIR QUALITY COALITION, a fiscally sponsored project of Social and Environmental Entrepreneurs, Inc., COMMITTEE FOR A BETTER ARVIN, a nonprofit corporation, COMMITTEE FOR A BETTER SHAFTER, a nonprofit corporation, DELANO GUARDIANS, an unincorporated association, and SOCIAL AND ENVIRONMENTAL ENTREPRENEURS, INC., a nonprofit corporation,<br><br>        Plaintiffs,<br><br>v.<br><br>SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT, and the GOVERNING BOARD OF THE SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT,<br><br>        Defendants. | CASE NO.: 1:23-CV-00794<br><br>BEFORE THE HONORABLE JUDGE ANA DE ALBA<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES (FRCP 12(B)(1). 12(B)(6); DECLARATION OF BRADLEY R. HOGIN**<br><br>Hearing Dates Pending:<br>Date:   July 24, 2023<br>Time: 1:30 p.m.<br>Courtroom: 1<br><br>DATE ACTION FILED: May 24, 2023<br>TRIAL DATE: none |

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1

1775651.1

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on July 24, 2023 at 1:30 p.m. or as soon thereafter as the matter may be heard in Courtroom 1 of the above-entitled Court, located at 2500 Tulare Street, Fresno, California, the San Joaquin Valley Unified Air Pollution Control District and the Governing Board of the San Joaquin Valley Unified Air Pollution Control District (collectively the "Air District") will and hereby do move the Court for an order dismissing the complaint of Plaintiffs Central Valley Air Quality Coalition, Committee for a Better Arvin, Committee for a Better Shafter, Delano Guardians, and Social and Environmental Entrepreneurs, Inc., in accordance with Federal Rules of Civil Procedure Rules 12(b)(1) and 12(b)(6).  The Motion will be made on the grounds that the Court does not have subject matter jurisdiction over the complaint, or, in the alternative, that the complaint fails to state a claim upon which relief can be granted, because Section 304(a)(1) does not authorize a lawsuit against an air quality regulator based on an alleged failure to implement a SIP.

This motion is made following the conference of counsel pursuant to the Court's Standing Order which took place on June 7, 2023.

This Motion is based upon this notice of motion, the attached memorandum of points and authorities, and on such other oral and documentary matters as may be presented to the Court at or before the hearing on this motion.

DATED:  June 15, 2023                    WOODRUFF & SMART, APC


By:_____
BRADLEY R. HOGIN
Attorneys for Defendants THE SAN JOAQUIN
VALLEY UNIFIED AIR POLLUTION CONTROL
DISTRICT AND THE GOVERNING BOARD OF
THE SAN JOAQUIN VALLEY UNIFIED AIR
POLLUTION CONTROL DISTRICT

1775651.1

# TABLE OF CONTENTS

**PAGE**

Introduction .........................................................................................................................8

I.   Regulatory and Factual Background. ..........................................................................8

    A.   The Air District's Role Under the Clean Air Act. ...............................................8

    B.   The Air District's New Source Review Program. .............................................11

    C.   The Complaint. ................................................................................................15

II.  Section 304(a)(1) Does Not Authorize Suits Against Regulators Based on Regulatory Activity -- it Only Allows Suits Against *Polluters*. ..........................................................15

    A.   A Regulatory Agency's Failure Implement a SIP is Not a "Violation" of the SIP Within the Meaning of Section 304(a)(1). ......................................................16

        1.   The Act Consistently Uses the Term "Violation" to Refer to Noncompliance by *Polluters*, Not Regulators. ..........................................17

        2.   The Act *Never* Uses the Term "Violation" to Describe a State's Failure to Enforce or Implement a SIP ..................................................................21

    B.   Plaintiffs' Interpretation is Wholly Inconsistent with the Clean Air Act Sanctions Scheme. ........................................................................................22

    C.   Cases Cited by Plaintiffs During the Meet and Confer Process Have No Relevance Here. ..............................................................................................24

Conclusion ........................................................................................................................25

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1775651.1

1

**TABLE OF AUTHORITIES**

2

**PAGE**

3

<u>FEDERAL CASES</u>

4

*Askins v. Ohio Dep't of Agriculture*, 809 F.3d 868 (6th Cir. 2016)....................................... 20

5

*Ass'n of Irritated Residents*, 790 F.3d 934 (9th Cir. 2015) ........................................... 10, 13

6

*Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*,
366 F.3d 692 (9th Cir. 2004) ............................................................................................. 25

7

8

*Bennett v. Spear*, 520 U.S. 154, 174 (1997) ............................................................... passim

*Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008)........................................................... 20

9

*Brown v. EPA*, 521 F.2d 827 (9th Cir. 1975)..................................................................... 24

10

*Cal. Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500 (9th Cir. 2015) ......................... 9

11

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984)...................... 13

12

*City and County of San Francisco v US Dept of Transportation*,
796 F.3d 993 (9th Cir. 2015) ("*San Francisco*")......................................................... 21, 25

13

14

*City of Fairborn, Ohio v. EPA*  (S.D. Ohio, Mar. 13, 2023,
No. 3:22-CV-102) 2023 WL 2478572 ............................................................................. 18

15

*Committee for a Better Arvin v. U.S. E.P.A.*, 786 F.3d 1169 (9th Cir. 2015)..................... 25

16

*Cross Timbers Concerned Citizens v. Saginaw*, 991 F. Supp.
563 (N.D. Tex. 1997)......................................................................................................... 21

17

18

*Davis v. E.P.A.*, 348 F.3d 772 (9th Cir. 2003) ................................................................... 10

19

*El Comite Para el Bienestar de Earlimart v. U.S. E.P.A.*  786 F.3d
688 (9th Cir. 2015) ............................................................................................................ 10

20

*Engine Mfrs. Ass'n v. E.P.A*, 88 F.3d 1075 (D.C. Cir. 1996)............................................ 12

21

22

*League to Save Lake Tahoe v. Trounday*, 598 F.2d 1164 (9th Cir. 1979)......................... 25

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456
U.S. 353 (1982) ........................................................................................................... 16, 17

23

24

*Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001)............................................................. 9

25

*Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Assn.*,
453 U.S. 1 (1981) .............................................................................................................. 16

26

*Nat. Res. Def. Council, Inc. v. S. Coast Air Quality Mgmt. Dist.*,
651 F.3d 1066 (9th Cir. 2011) ..................................................................................... 13, 15

27

28

*Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air
Pollution Control Dist.*, 627 F.3d 730 (9th Cir. 2010) .................................................... 12

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1775651.1

*New York v. United States*, 505 U.S. 144 (1992) .................................................................. 24

*Physicians Comm. for Responsible Medicine v. Johnson*, 436
    F.3d 326 (2d Cir. 2006) .................................................................................................. 21

*Russello v. U.S.*, 464 U.S. 16, 23 (1983) ............................................................................ 23

*Safe Air for Everyone v. EPA*, 488 F. 3d 1088 (9th Cir. 2007) ....................................... 10

*Sierra Club v Korleski*, 681 F.3d 342 (6th Cir. 2012) ................................................ passim

*U.S. v. LKAV*, 712 F.3d 436 (9th Cir.2013) ...................................................................... 16

## FEDERAL STATUTES

16 United States Code section 1540(a) .............................................................................. 20

16 United States Code section 1540(e)(3) ......................................................................... 20

16 United States Code section 1540(b) .............................................................................. 20

16 United States Code section 1540(g)(1)(A) .................................................................. 19

42 United States Code section 7407 .................................................................................. 10

42 United States Code section 7407(d)(1) ........................................................................ 10

42 United States Constitution section 7409 ...................................................................... 10

42 United States Code section 7410(a) .............................................................................. 10

42 United States Code section 7410(a)(1) ......................................................................... 10

42 United States Code section 7410(a)(2) ......................................................................... 10

42 United States Constitution section 7413(a)(1)(A) ...................................................... 24

42 United States Code section 7413(a)(1)(A)-(C) ........................................................... 23

42 United States Code section 7413(a)(2) ......................................................................... 24

42 United States Code section 7413(b) .............................................................................. 18

42 United States Constitution section 7413(c)(1) ............................................................ 18

42 United States Code section 7501 .................................................................................. 10

42 United States Code section 7501(2) .............................................................................. 11

42 United States Code section 7502(c)(5) ......................................................................... 13

42 United States Code section 7503(a) .............................................................................. 13

42 United States Code section 7503(a)(1) ......................................................................... 13

42 United States Code section 7503(c)(2) ......................................................................... 13

1775651.1

42 United States Code section 7509 ................................................................................. 24, 25

42 United States Code section 7509(a) ........................................................................... 22, 24

42 United States Code section 7509(a)(4) ............................................................................. 22

42 United States Code section 7511 ..................................................................................... 11

42 United States Code section 7604(a)(1) ...................................................................... 16, 17

42 United States Code section7503(c) .................................................................................. 15

42 Unites States Code section 7502(c)(1) ............................................................................ 10

42 United States Code Section 7604(a)(2) ........................................................................... 23

42 United States Code section 9659(a)(1) ............................................................................ 20

49 United States Code section 60121 ................................................................................... 21

Federal Rules of Civil Procedure Rule 12(b)(1)        2

Federal Rules of Civil Procedure Rule 12(b)(6) ..................................................................... 2

**STATE STATUTES**

Health & Safety Code section 40000 ................................................................................... 11

Health & Safety Code section 40001 ................................................................................... 11

Health & Safety Code section 40600 ................................................................................... 11

Health & Safety Code section 40920.5 ................................................................................ 13

Health & Safety Code section 42301(b) .............................................................................. 14

Health & Safety Code section 42301.2 ................................................................................ 14

**REGULATIONS**

40 Code of Federal Regulation Part 50 ............................................................................... 10

40 Code of Federal Regulations Part 51 .............................................................................. 10

40 Code of Federal Regulation section 51.165(a)(1) (xxxvi)(A) ........................................ 10

40 Code of Federal Regulations Part 51, App. S, IV.C.5 ................................................... 13

40 Code of Federal Regulations section 51.100(s) ............................................................. 10

40 Code of Federal Regulations section 51.165(a)(3) ........................................................ 13

40 Code of Federal Regulations section 51.165(a)(3)(i)(C)(1) .......................................... 13

40 Code of Federal Regulations section 52.220 ................................................................. 11

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1775651.1

40 Code of Federal Regulations section 52.220a............................................................. 11

40 Code of Federal Regulations Part 81 ....................................................................... 10

40 Code of Federal Regulations section 81.165 ............................................................ 11

**<u>OTHER</u>**

Clean Air Act section 304(a)(1)............................................................... 2, 9, 16, 17

**<u>FEDERAL REGISTER</u>**

40 Fed Reg. 81.305 ..................................................................................... 11

64 Fed Reg. 1770-02 ................................................................................... 10

64 Fed Reg. 51,493-01 ................................................................................ 11

66Fed Reg. 37,578 ...................................................................................... 15

68 Fed Reg. 7330-01 ................................................................................... 14

71 Fed Reg.63,641 ...................................................................................... 12

73 Fed Reg. 22,307 ..................................................................................... 12

81 Fed Reg. 46,608 ..................................................................................... 12

86 Fed Reg. 38652 ...................................................................................... 12

87 Fed Reg. 45,730-01 ................................................................................ 15

87 Fed Reg. 4503 ........................................................................................ 12

87 Fed Reg. 45730 ...................................................................................... 15

87 Fed Reg. 45730-01 ................................................................................. 15

87 Fed Reg. 45733 ...................................................................................... 15

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1775651.1

**Introduction**

This case should be dismissed because Section 304(a)(1) of the Clean Air Act (the "Act") does not authorize a citizen to challenge *regulatory action* by a state agency.  The Act gives the U.S. Environmental Protection Agency ("EPA") the exclusive authority to enforce the Act's requirements as against state regulatory agencies.  Section 304(a)(1) can only be used to sue *polluters* who "violate" an "emission standard of limitation" in effect under the Act.  This is clear from the language of Section 304(a)(1), the language of other sections in the Act, and the Act's overall structure.  There are two basic points to be made.

*First*, the Act's enforcement provisions consistently and exclusively use the term "violation" to refer to noncompliance by polluters.  And, the Act *never* uses the term "violation" to refer to any noncompliance by a state regulatory agency.  A state agency's failure to implement a State Implementation Plan ("SIP"), for example, is called a "deficiency" rather than a violation.  The intent of Congress is abundantly clear from its choice of words, both in Section 304(a)(1) and elsewhere in the Act: Section 304(a)(1) was only intended to allow a citizen suit against a polluter.

*Second*, Plaintiffs' interpretation of Section 304(a)(1) is inconsistent with the sanctions scheme and indeed the larger structure of the Act as an example of cooperative federalism.  The Act, for example, does not give EPA the authority to *compel* a state agency to comply with, enforce, or implement a SIP.  EPA can only *induce* a state agency into compliance with the threat of sanctions such as the loss of highway funding.  Yet Plaintiffs would have this Court believe that a citizen *can* compel a state agency to comply with a SIP by using Section 304(a)(1) to obtain injunctive relief.  It defies logic to suggest that Congress intended to give citizens greater powers of enforcement than EPA.  This Court should reject Plaintiffs' interpretation.

I.    **Regulatory and Factual Background.**

A.    **The Air District's Role Under the Clean Air Act**.

Often referred to as an "experiment in cooperative federalism," the federal Clean Air Act (the "Act") creates a "partnership" between the federal Environmental Protection Agency ("EPA") and the states for the purpose of controlling air pollution.  *Cal. Dump Truck Owners Ass'n v. Nichols*, 784 F.3d 500, 502-3 (9th Cir. 2015); *Michigan v. EPA*, 268 F.3d 1075, 1078 (D.C. Cir. 2001).  For its part, EPA sets the "national ambient air quality standards" ("NAAQS") at levels that will protect

public health and welfare with an adequate margin of safety.  42 U.S.C. § 7409.  Each NAAQS establishes a maximum allowable concentration of a pollutant in the ambient air.  40 C.F.R. Part 50.

For their part, the states must prepare and implement "State Implementation Plans" ("SIPs") designed to achieve and maintain the NAAQS.  42 U.S.C. § 7410(a)(1); *see Ass'n of Irritated Residents*, 790 F.3d 934, 937 (9th Cir. 2015).  SIPs must contain enforceable emissions limitations and other "control measures, means or techniques" as may be necessary to achieve the Act's goals.  42 U.S.C. § 7410(a)(2).  Plans for nonattainment areas must "provide for the implementation of all reasonably available control measures as expeditiously as practical."  42 U.S.C. § 7502(c)(1).  States must submit proposed SIPs to EPA for review and approval according to specified criteria set forth in the Act and its implementing regulations.  42 U.S.C. §§ 7410(a), 7501 *et seq.*; 40 C.F.R. Part 51.  Once approved, a SIP's requirements have the force and effect of federal law.  *El Comite Para el Bienestar de Earlimart v. U.S. E.P.A.*  786 F.3d 688, 692 (9th Cir. 2015); *Safe Air for Everyone v. EPA*, 488 F. 3d 1088, 1091 (9th Cir. 2007).

EPA has promulgated NAAQS for ozone, sulfur dioxide, carbon monoxide, nitrogen dioxide, lead, and two types of particulate matter known as "$PM_{10}$," and "$PM_{2.5}$."  40 C.F.R. Part 50.  Ozone as such is not directly emitted by human sources.  Rather, ozone forms in the ambient air through the reaction of nitrogen oxides ("NOx") and volatile organic compounds ("VOCs")[1] in the presence of sunlight.  Thus, both NOx and VOCs are regulated as ozone "precursors."  40 C.F.R. § 51.165(a)(1) (xxxvi)(A).  NOx is also regulated as a precursor to $PM_{2.5}$.  *Davis v. E.P.A.*, 348 F.3d 772, 784 (9th Cir. 2003); Approval and Promulgation of State Implementation Plans; California—South Coast, 64 Fed. Reg. 1770-02 (Jan. 12, 1999).

Pursuant to the Act, EPA has divided the country into "air quality control regions" ("Regions").  42 U.S.C. § 7407; 40 C.F.R. Part 81.  EPA classifies each Region based on whether the region meets each of the NAAQS.  42 U.S.C. § 7407(d)(1); *see Ass'n of Irritated Residents*, 790 F.3d at 937.  If a Region meets the NAAQS for a particular pollutant, EPA designates the Region as "attainment" for that pollutant.  Conversely, if a Region has not attained the NAAQS for a particular

---

[1] VOCs include most chemical compounds that contain carbon molecules.  (40 C.F.R. § 51.100(s).)

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

pollutant, EPA designates that Region as a "nonattainment" for that pollutant. *Id.*; 42 U.S.C. § 7501(2). A Region might be designated "attainment" for one or more pollutants yet be designated "nonattainment" for one or more other pollutants. *See e.g.*, 40 C.F.R. § 81.305. EPA further classifies nonattainment areas based on the severity of the exceedance. 42 U.S.C. § 7511. Nonattainment areas can be classified as "Marginal," "Moderate," "Serious," "Severe," or "Extreme." *Id.*

EPA has designated the San Joaquin Valley Air Basin[2] (the "Basin") as an air quality control region under the Act. 40 C.F.R. § 81.165. The Air District plays a key role in implementing the Act within the Basin. The Air District has "primary responsibility" for controlling air pollution from sources other than motor vehicles. Cal. Health & Safety Code § 40000. The Air District is charged with adopting and enforcing rules and regulations for sources under its jurisdiction. The rules and regulations are designed to achieve and maintain the NAAQS. Cal. Health & Safety Code § 40001. The Air District also prepares and implements the Basin's portion of the SIP, which consists largely of Air District rules and regulations for stationary sources, along with mobile source measures adopted by the California Air Resources Board ("CARB"). Cal. Health & Safety Code § 40600; 40 C.F.R. §§ 52.220, 52.220a.

The Basin is currently designated "Extreme" nonattainment for the 1997, 2008, and 2015 ozone NAAQS and "Serious" nonattainment for the 1997, 2006, and 2012 $PM_{2.5}$ NAAQS. 40 C.F.R. § 81.305. Attaining the ozone and $PM_{2.5}$ NAAQS in the Basin has proven to be very challenging due to the Basin's large population, mix of land uses, topography, and meteorology. The Basin has countless sources of air pollution including "mobile sources" such as passenger vehicles, heavy duty trucks, locomotives, and aircraft, as well as stationary sources, such as industrial plants, agricultural operations, hospitals, public safety operations, water treatment facilities, and power plants, among others. In addition, air pollution generated in other regions, notably the San Francisco Bay area, can reach the Basin. Whatever the origin, air pollution often

---

[2] The Basin consists of Fresno County, a portion of Kern County, Kings County, Madera County, Merced County, San Joaquin County, Stanislaus County, and Tulare County. Clean Air Act Approval and Promulgation of California State Implementation Plan for the San Joaquin Valley Unified Air Pollution Control District, 64 Fed. Reg. 51,493-01 (Sept. 23, 1999).

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

becomes trapped in the Basin by surrounding mountains and atmospheric temperature "inversion

layers." *See* Approval and Promulgation of Implementation Plans; Redesignation of the San Joaquin

Valley Air Basin PM-10 Nonattainment Area to Attainment, 73 Fed. Reg. 22,307 (April 25, 2008).

Inversion layers develop when a layer of relatively cooler air sits atop a layer of relatively warmer

air, thus preventing air from rising up and dispersing.  Between the mountains and the inversion

layers, the Basin is essentially like a "bowl" with a "lid" that contains air pollutants in the Basin,

sometimes for weeks and perhaps even months.

Moreover, the Air District only has authority to control emissions from stationary sources,

which make up only about 12% of the Basin's ozone and PM-forming NOx emissions inventory.

EPA and the California Air Resources Board, between them, have exclusive authority to regulate

area and mobile source emissions,[3] which make up the remaining 88% of the Basin's ozone and PM-

forming NOx emissions inventory.[4]

Despite the natural and manmade obstacles, the Air District has achieved significant

emissions reductions in the Basin.  By adopting and implementing some of the most stringent air

quality rules in the nation, the Air District has reduced emissions from stationary sources in the

Basin by 93% since 1980.  Annual Report to the Community, San Joaquin Valley Air Pollution

Control District 2021-22, RJN, Ex. D., p. 3.  In addition, the Air District achieved attainment of the

$PM_{10}$ standard in 2005, the 1-Hour ozone standard in 2014, and the 1997 24-hour $PM_{2.5}$ standard in

2022.  *See* 71 Fed. Reg. 63,641 (Oct. 30, 2006), 81 Fed. Reg. 46,608 (July 18, 2016), 87 Fed. Reg.

4503 (Jan. 28, 2022).

**B.   The Air District's New Source Review Program.**

Under Section 172 of the Act, each SIP prepared for a nonattainment area must contain a

"new source review" permit program ("NSR Program") for new and modified "major[5] stationary[6]

[3] *Engine Mfrs. Ass'n v. E.P.A*, 88 F.3d 1075, 1079-80 (D.C. Cir. 1996); *Nat'l Ass'n of Home Builders v. San Joaquin Valley Unified Air Pollution Control Dist.*, 627 F.3d 730, 733 (9th Cir. 2010).

[4] See, *e.g.*, 86 Fed.Reg. 38652,  (July 22, 2021), Table 2, in which the stationary source base year NOx emissions inventory of 38.6 tons per day equates to 12% of the total NOx inventory of 317.2 tons per day.

[5] A new or modified source of nonattainment emissions is considered "major" if it will generate nonattainment emissions above specified thresholds.  (40 C.F.R. § 51.165(a)(1)(iv)(A).)

[6] For purposes of new source review, a "stationary source" is any "building, structure, facility, or installation

1775651.1

sources" of air pollution.  42 U.S.C. § 7502(c)(5); *see Ass'n of Irritated Residents*, 790 F.3d at 937; *Nat. Res. Def. Council, Inc. v. S. Coast Air Quality Mgmt. Dist.*, 651 F.3d 1066, 1069 (9th Cir. 2011).  Under Section 173, each NSR Program must require "pre-construction review" of proposed new and modified sources according to specified criteria.  42 U.S.C. § 7503(a); 40 C.F.R. § 51.165(a)(3).

Each NSR Program must ensure that nonattainment emissions from new and modified sources are "offset" with emissions reductions of the same type, in an equal or greater amount, from existing permitted sources.  42 U.S.C. § 7503(a)(1); Cal. Health & Safety Code § 40920.5; *see generally*, *Nat. Res. Def. Council, Inc. v. S. Coast Air Quality Mgmt. Dist.*, 694 F. Supp. 2d 1092, 1097-98 (C.D. Cal. 2010, *aff'd,* 651 F.3d 1066 (9th Cir. 2011).[7]  A company can create offsets by shutting down one or more pieces of existing equipment, curtailing production or operating hours, or installing pollution control equipment not otherwise required by existing regulations.  40 C.F.R. § 51.165(a)(3)(i)(C)(1).  Emissions reductions can be used as offsets right away, or they can be registered with the permitting agency as "emissions reduction credits" ("ERCs").  Once registered, ERCs can "banked" with the permitting agency for use a later time and/or sold on the open market.  *Cf.* 40 C.F.R. § Pt. 51, App. S, IV.C.5.

In order to be used as offsets, emissions reductions must be "surplus" to other existing SIP requirements.[8]  That is, emissions reductions *cannot* be used to offset new nonattainment emissions if the emissions reductions are *otherwise required* under the SIP's rules, regulations, or commitments.[9]  The surplus requirement is intended to ensure that NSR Permit Programs do not "double-count" emissions reductions by (1) allowing applicants to use emission reductions as offsets for purposes of NSR permitting, and (2) at the same time otherwise rely on the emissions reduction

---

which emits or may emit a regulated NSR pollutant."  (40 C.F.R. § 51.165(a)(1)(i).)

[7] The offsets requirement was intended to balance the "economic interest in permitting capital improvements" with "the environmental interest in improving air quality" by allowing new development in nonattainment areas, as long as the new development does not interfere with reasonable further progress towards attainment of the NAAQS.  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 851 (1984).

[8] The surplus requirement originates in Section 173(c)(2), which states that "[e]mission reductions *otherwise required by this chapter* shall not be creditable as emissions reductions for purposes of any such offset requirement." (emphasis added.)  42 U.S.C. § 7503(c)(2).

[9] A SIP "commitment" may exist if the SIP has already relied on the reduction for planning purposes.

to demonstrate "reasonable further progress" toward, and attainment of, the NAAQS.  Revisions to the California State Implementation Plan, San Joaquin Valley Unified Air Pollution Control District, 68 Fed. Reg. 7330-01 (February 13, 2003).

The Air District's NSR Program is set forth in its Regulation II.  Under Rule 2010, any person seeking to construct or modify a source of air pollutants must apply for and receive an "Authority to Construct."  Rule 2010, § 3, RJN, Ex. A, p. 1.  Under Rule 2201, the applicant must comply with a variety of pre-construction review requirements including, among others, the requirement to provide offsets for any nonattainment emissions.  Rule 2201, § 4.5, RJN, Ex. B, p. 15.[10]  Importantly, ERCs cannot be used to satisfy or avoid stationary source emission control requirements.  Offsets requirements are applied *only after* the applicant complies with all applicable prohibitory rules and application of Best Available Control Technology (BACT).  Cal. Health & Safety Code §§ 42301(b), 42301.2.[11]  EPA has approved Rules 2010 and 2201 as part of the California SIP.[12]

The Air District's offset requirements depart from the federal regulations in certain respects. EPA has found that some of the District requirements are more stringent than the federal regulations. The Air District, for example, requires offsets fugitive emissions that are generally not required by federal regulations.[13]  In addition, the Air District deducts ten percent of each ERC and sets it aside.[14]  Thus, in some respects Rule 2201 generates more offsets than would be required under the federal regulations.

Some of the District's requirements, however, are less stringent than the federal regulations. Notably, under Rule 2201, the surplus value of offsets is based on "time-of-issuance" or when the Air District certified their use as ERCs.  The offsets retain this value until they are ultimately used

---

[10] Under Section 4.5.3, the offset requirement only applies if the new or modified source will exceed certain thresholds for nonattainment emissions.  Rule 2201 § 4.5.3, RJN Ex. B, p. 15.

[11] *See also* Rule 2201, §§ 3.27, 4.1, 4.5.3, 4.10, 5.6, 5.7.

[12] 40 C.F.R. §§ 52.220 (c)(199)(i)(D)(6), 52.220 (c)(400)(i)(A)(1).

[13] For example, Rule 2201, §§ 3.19, 43.24.1, 4.7 requires offsets for all fugitive emissions above major source thresholds.  Federal regulations do not. 40 C.F.R. § 51.165.

[14] Rule 2201, § 4.12.1.

13

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

by an applicant in connection with NSR permitting.  Rule 2201, § 7.1.3.1, RJN Ex. B, p. 34.  In contrast, federal regulations require the value of offsets to be surplus at "time-of-use" whereby the surplus value of offsets is discounted when the offsets are proffered by a permit applicant in connection with NSR Permitting based on SIP requirements at that time.  42 U.S.C. § 7503(c).[15]  This difference is significant because, under the federal approach, the surplus value of offsets usually reduces over time as the Air District's rules and regulations become more stringent.  That is, what was "surplus" twenty years ago may no longer be surplus if (as is likely) the Air District has adopted additional control requirements on the type of source in question.  Simply put, the surplus value at "time-of-issuance" will nearly always be more than the surplus value at "time-of-use" – often far more.  Limited Approval and Limited Disapproval of California Air Plan Revisions; San Joaquin Valley Air Pollution Control District; Stationary Source Permits, 87 Fed. Reg. 45,730-01 (July 29, 2022).

EPA approved Rule 2201 in 2001 despite this significant difference because of the offsets "tracking system" and "equivalency demonstration" required in Section 7.  Taken together, those requirements ensure that Rule 2201 achieves emissions reductions that are, in the aggregate, "equivalent to" what would otherwise be achieved under the federal program.  66 Fed. Reg. 37,578, 37,589 (July 19, 2001).  Section 7 of Rule 2201 works as follows.  Once a year, the Air District prepares an Annual Demonstration Report which compares (1) the amount and value offsets required by federal regulations, with (2) the amount and value offsets required by Rule 2201.  If Rule 2201 required less offsets than would have been required under the federal regulations, then the Air District makes up the difference by identifying surplus emissions reductions that have not otherwise been used as ERCs and applying them as offsets to the overall "deficit."  These excess emissions reductions come from a variety of sources, including "orphan" shutdowns and orphan reductions,[16]

---

[15] *See also* Limited Approval and Limited Disapproval of California Air Plan Revisions; San Joaquin Valley Air Pollution Control District; Stationary Source Permits, 87 FR 45730-01, 45733 (July 29, 2022), 87 Fed. Reg. 45730, 45733, fn. 8.

[16] An orphan shutdown occurs when the owner of permitted equipment shuts the equipment down and does not receive offset credits from the Air District.  *Nat. Res. Def. Council, Inc.*, 694 F. Supp. 2d 1092 at 1100.  An orphan reduction occurs when the owner of permitted equipment reduces emissions below required levels, and the Air District does not issue any ERCs.  *Id.*

electrification projects which are not required by existing regulations, ERCs reserved or withdrawn for projects where an applicant had already filed an application for an "authority to construct," and the 10% deduction for newly banked ERCs.  The Air District tracks these excess emissions reductions in an "equivalency bank" that is separate from the District's ERC bank.  In this way, Section 7 allows the Air District to demonstrate equivalency by comparing emissions reductions with emissions increases on an aggregate, regional basis, rather than "source-specific," basis.  EPA has approved this and other equivalency tracking systems that demonstrate equivalency on a regional basis.[17]

      **C.**     **The Complaint.**

      Plaintiffs' Complaint purports to sue the Air District under the Act's citizen suit provision set forth at Section 304(a)(1) (42 U.S.C. § 7604(a)(1)).  Each claim for relief in the Complaint describes some alleged noncompliance with Section 7 of Rule 2201 and concludes that the defendants "violated and continue to violate an emission standard or limitation within the meaning of the Clean Air Act's citizen suit provision."

**II.**     **Section 304(a)(1) Does Not Authorize Suits Against Regulators Based on Regulatory Activity -- it Only Allows Suits Against _Polluters_.**

      Whether a federal statute authorizes a private right of action turns on Congressional intent. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 377-78 (1982); *Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Assn*., 453 U.S. 1, 13 (1981).  In determining Congressional intent, courts will consider the plain words of the statute and "particularly to the provisions made therein for enforcement and relief."  *Middlesex Cnty.* 453 U.S. at 13; *City & Cnty. of San Francisco v. U.S. Dep't of Transp*., 796 F.3d 993, 998 (9th Cir. 2015).  Courts will consider "similar provisions within the statute as a whole and the language of related or similar statutes" (*U.S. v. LKAV*, 712 F.3d 436, 440 (9th Cir.2013)) as well as the legislative history, the statutory structure,

---

[17] *See, e.g.*, South Coast Air Quality Management District Regulation XIII, Rule 1315.  RJN Ex. C.  The SCAQMD tracking system demonstrates that "sufficient emission reductions, including previously-untracked emission reductions, existed beyond regulatory requirements under federal law to be used as offset credits to establish that the District's NSR program is equivalent with federal NSR offset requirements. . ."  Rule 1315(a)(2).  *Id*. at p. 1.

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1775651.1

and "other traditional aids of statutory interpretation." *Middlesex Cnty.*, 453 U.S. at 13.  "The key to the inquiry is the intent of the Legislature." *Merrill Lynch*, 456 U.S. at 378.

Here, it is clear that Congress did *not* intend to allow citizen suits under Section 304(a)(1) against a regulatory agency based on the agency's failure to implement a provision of a SIP.

**A.   A Regulatory Agency's Failure Implement a SIP is Not a "Violation" of the SIP Within the Meaning of Section 304(a)(1).**

Section 304(a)(1), entitled "Citizen Suits," provides in relevant part as follows:

> ". . . any person may commence a civil action on his own behalf--
>
> (1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency . . . *who is alleged to have violated . . . or to be in violation of* . . . an emission standard or limitation under this chapter . . ." 42 U.S.C § 7604(a)(1) (emphasis added).

In *Sierra Club v Korleski*, 681 F.3d 342 (6th Cir. 2012) ("*Korleski*"), the Sixth Circuit held that this language was never intended to authorize a citizen suit against a state regulatory agency based on its failure to implement a provision of a SIP.[18]  In *Korelski*, a provision of the Ohio SIP's NSR Program required the Ohio EPA to make "best available technology" ("BAT") determinations before issuing permits to new and modified sources. *Id*. at 344.  The Ohio EPA complied with the BAT requirement for decades until the Ohio legislature passed a law allowing the issuance of NSR permits to new and modified "small" emissions sources, as defined, without making BAT determinations. *Id*.  Thereafter, the Ohio EPA stopped making BAT determinations, despite the fact that the requirement was still in the SIP. *Id*.

An environmental group sued the Ohio EPA's administrator under Section 304(a)(1).  The Complaint alleged that the SIP's BAT determination requirement was an "emissions standard or limitation" that the Ohio EPA "violated" every time it issued an NSR Permit to a small source

---

[18] The Court acknowledged that a citizen suit will lie against a government agency which *itself* discharges air emissions in violation of a SIP-approved rule.  That, of course, is not the case here.  The Air District here is being sued based on an alleged regulatory failure.

16

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

without making a BAT determination.  *Id.* at 344-45.  In defending the case, the administrator argued that the term "violation" as used in Section 304(a)(1) does not apply to a state agency's failure to enforce a SIP provision.  The Court in *Korelski* agreed.  Based on the "text and structure" of the Act, the Court concluded, it is "plain" that Section 304(a)(1) does not authorize citizen suits "against state regulators *qua* regulators."  *Id.* at 351.  Rather, Section 304(a)(1) "is only a means by which 'parties may enforce substantive provisions of the [CAA] against regulated parties.'"  *Id.* (quoting *Bennett v. Spear*, 520 U.S. 154, 174 (1997)).[19]  For the reasons set forth below, *Korleski* was well-reasoned, correctly decided, and should be followed here.

1.   **The Act Consistently Uses the Term "Violation" to Refer to Noncompliance by *Polluters*, Not Regulators.**

The language of Section 304(a)(1) must be considered in the context of other provisions in the Act.  And, as the Court explained in *Korelski*, the Act consistently refers to "violations" of a SIP in ways that *clearly* were not intended to apply to regulators acting in their regulatory capacity.  *Id.* at 348.  Section 113 of the Act, for example, authorizes EPA to assess civil penalties against any person who "has violated" or "is in violation of," any SIP requirement.  42 U.S.C. § 7413(b).  EPA can recover civil penalties of up to $25,000 per day for each violation.  Under Section 113(c)(1), any "knowing violation" of any SIP requirement is punishable by a criminal fine and/or imprisonment not to exceed five years, or both.  42 U.S.C. § 7413(c)(1).  In the event of a second conviction, the maximum fine and the maximum prison term "shall both be doubled."  *Id.*  As the Court noted in *Korleski*, it is simply "implausible" to suggest that the Act was intended to authorize civil penalties of $25,000 per day, criminal fines, and five years' imprisonment of a state official based on the official's failure to implement a SIP provision.  *Id.* at 349.  Clearly, when the Act refers to a "violation" of a SIP, it was intended to mean only noncompliance by a regulated polluter.[20]

The Supreme Court in *Bennett v. Spear*, 520 U.S. 154 (1997) ("*Bennett*") addressed

---

[19] *Korleski* has been followed by other courts.  *See, e.g.*, *City of Fairborn, Ohio v. EPA*  (S.D. Ohio, Mar. 13, 2023, No. 3:22-CV-102) 2023 WL 2478572.

[20] This Motion does not address whether Section 7 of Rule 2201 sets forth "emission standards or limitations."  The Air District will reserve argument on that issue.

1775651.1

essentially the same issue, involving "virtually identical"[21] language, albeit in a different environmental statute.  In *Bennett*, the Supreme Court held that the citizen suit provision of the Endangered Species Act ("ESA") can only be used to sue "regulated parties" and cannot be used to challenge F&WS's "implementation of" the ESA.  *Bennett*, 520 U.S. at 173.  The Court in *Korelski* correctly applied the same reasoning to the same language to reach the same result.  *Korleski*, 681 F.3d at 348-49.  Thus, *even in the absence of Korelski*, the Supreme Court's opinion would be controlling here.

In *Bennett*, ranchers and irrigation districts filed a citizen suit under Section 11(g)(1)(A) of the ESA (16 U.S.C. § 1540(g)(1)(A)).  *Bennett*, 520 U.S. at 159.  The suit alleged that a biological opinion issued by F&WS for two fish species failed to comply with ESA requirements.  *Id*.  The suit also alleged that F&WS' decision to require minimum water levels on two reservoirs implicitly constituted a "critical habitat" determination.  *Id*.  Thus, the plaintiffs claimed, F&WS violated the ESA by making a critical habitat determination without considering the resulting economic impacts.  *Id*.  F&WS argued in *Bennett* that the case should be dismissed because ESA's citizen suit provision does not authorize a suit against FW&S based on action taken in its capacity as administrator of the ESA.  *Id*. at 171.

The ESA citizen suit provision, set forth in Section 11(g)(1)(A) of the ESA, provides in relevant part as follows:

". . . any person may commence a civil suit on his own behalf--

(A) to enjoin any person, including the United States and any other

governmental instrumentality or agency (to the extent permitted by the

eleventh amendment to the Constitution), who is alleged to be in violation of

any provision of this chapter or regulation issued under the authority thereof."

16 U.S.C. § 1540(g)(1)(A).

The Supreme Court in *Bennett* considered both the language of Section 11(g)(1) and the larger context of the ESA's provisions.  *Id*. at 171-4.  The Supreme Court found that the term

---

[21]Section 11(g)(1) of the ESA was, in fact, "patterned after" Section 304(a)(1).  *Korleski*, 681 F.3d at 346.

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

"violation" as used in Section 11(g)(1) "does not include the Secretary's failure to perform his duties as administrator of the ESA." *Id.* at 173. In support of this conclusion, the Supreme Court noted that the ESA uses the term "violation" elsewhere "in contexts in which it is most unlikely to refer to failure by the Secretary or other federal officers and employees to perform their duties in administering the ESA." *Id.* at 174. The Supreme Court cited, for example, a provision authorizing civil penalties against "[a]ny person who knowingly violates" any ESA provision. 16 U.S.C. § 1540(a). The Supreme Court explained that "[w]e know of no precedent for applying such a provision against those who *administer* (as opposed to those who are *regulated by*) a substantive law." *Id.* at 173-74 (emphasis added). The Supreme Court also did not "think it likely" that Congress intended to subject regulators acting as such to *criminal* penalties or *warrantless arrests*, both of which are available for knowing "violations" of the ESA.[22] *Id.* at 174. The Supreme Court concluded that "viewed in the context of the entire statute," Section 11(g)(1)'s reference to any "violation" of the ESA "cannot be interpreted to include the Secretary's maladministration of the ESA." *Id.*

In addition to the Sixth Circuit in *Korelski*, other Circuits have applied the *Bennett* decision to similar citizen suit provisions. *Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008), for example, involved a suit against the EPA administrator under Comprehensive Environmental Response, Compensation, and Liability Act's ("CERCLA") citizen suit provision. The suit alleged that EPA failure to fulfill mandatory post-disaster cleanup and public information duties set forth in CERCLA. *Id.* at 130. CERCLA's citizen suit provision, set forth at Section 310(a)(1), is very similar to the citizen suit provisions set forth in the Act and the ESA. 42 U.S.C. § 9659(a)(1). The Second Circuit applied *Bennett* in ruling that the term "violation" set forth in Section 310(a)(1) of CERCLA did not apply to a regulator's alleged failure to perform a regulatory duty. *Id.* at 133. Courts have reached the same conclusions with respect to citizens' suits brought under other similar citizen suit provisions. See, e.g., *Askins v. Ohio Dep't of Agriculture*, 809 F.3d 868 (6th Cir. 2016) (Clean Water Act citizen suit provision, "nearly identical" to citizen suit provisions in *Korleski* and *Bennett*,

---

[22] 16 U.S.C. § 1540(b), (e)(3).

does not allow claims against regulators based on regulatory activity); *Physicians Comm. for Responsible Medicine v. Johnson*, 436 F.3d 326, 334 (2d Cir. 2006) (Toxic Substances Control Act citizen suit provision does not allow claims against regulators based on regulatory activity, citing *Bennett*); *Cross Timbers Concerned Citizens v. Saginaw*, 991 F. Supp. 563, 567 (N.D. Tex. 1997) (Clean Water Act citizen suit provision, "substantially similar" to the ESA citizen suit provision in *Bennett,* does not allow claims against regulators based on regulatory activity).

Finally, the Ninth Circuit followed *Bennett* and approved of *Korleski* in *City and County of San Francisco v US Dept of Transportation*, 796 F.3d 993 (9th Cir. 2015) ("*San Francisco*"). In that case, the Ninth Circuit interpreted the citizen suit provision set forth in the Natural Gas Pipeline Safety Act ("NGPSA"). In *San Francisco*, a natural gas transmission line ruptured causing deaths, injuries, and widespread property damage. *Id*. at 995, 997. The plaintiff filed a citizen suit under Section 1(A) of the Natural Gas Pipeline Safety Act ("NGPSA") (49 U.S.C. § 60121) against the Pipeline and Hazardous Materials Safety Administration ("PHMSA"). *Id*. at 997-98. The suit alleged PHMSA violated the NGPSA when PHMSA found that the California Public Utilities Commission's activities met PHMSA's standards. *Id*. The NGPSA's citizen suit provision provides in relevant part as follows:

> (a) General authority.--(1) A person may bring a civil action in an appropriate
> district court of the United States for an injunction against another person
> (including the United States Government and other governmental authorities
> to the extent permitted under the 11th amendment to the Constitution) for a
> violation of this chapter or a regulation prescribed or order issued under this
> chapter. 49 U.S.C. § 60121.

The Court in *San Francisco* relied heavily on the *Bennett* decision. *Id*. at 999-1000. The Court noted that the language of the NGPSA's citizen suit provision was "very similar" to the ESA citizen suit provision at issue in *Bennett*. *Id*. at 999. The Court examined other provisions of the NGPSA, including the provisions for civil and penalties, and found that the NGPSA, like the ESA, "consistently and exclusively" uses the term "violation" to refer "substantive violations by regulated parties." *San Francisco*, 796 F.3d at 1000. Finally, the Court in *San Francisco* explained that the *Korelski* decision, among other cases from other circuit courts, supports the conclusion that the term

1775651.1

"violation" as used in the Section (A)(1) of the NGPSA, was intended to apply exclusively to violations of the PHMSA by regulated parties. *San Francisco*, 796 F.3d at 1000. The Court cited the *Korelski* holding with approval. *Id*. In light of *Bennett* and *Korelski*, the Court in *San Francisco* concluded as follows:

> "As in the context of the ESA, a "violation" of the Pipeline Safety Act is "most unlikely to refer to failure by the Secretary or other federal officers and employees to perform their duties in administering the [Pipeline Safety Act]." See *Bennett*, 520 U.S. at 173, 117 S.Ct. 1154." *San Francisco*. 796 F.3d 993, 1000.

The *San Francisco* and *Bennett* cases are, of course, binding on this Court. Given that they interpreted essentially the same language found in the Act, this Court should confirm that Congress never intended to allow claims under Section 304(a)(1) challenging regulatory action.

### 2. The Act *Never* Uses the Term "Violation" to Describe a State's Failure to Enforce or Implement a SIP.

While the Act consistently uses the term "violation" to refer to a polluter's failure to comply with a SIP, the Act *never* uses the term "violation" to refer to a regulatory agency's failure to enforce, implement, or comply with a SIP. Section 179, for example, specifies sanctions that EPA may apply to a state based on the state's failure to comply with a SIP. Section 179(a) provides in relevant part as follows:

> For any implementation plan or plan revision required under this part . . . if the Administrator . . . finds that any requirement of an approved plan (or approved part of a plan) is not being implemented, unless such *deficiency* has been corrected with 18 months after the finding . . . one of the sanctions referred to in subsection (b) shall apply. . ." 42 U.S.C. § 7509(a), (a)(4) (emphasis added).

As the Court explained in *Korelski*, it is very significant that Congress chose to describe a state's failure to implement SIP as a "deficiency" rather than a "violation." As the Court explained, "in construing a statute, the words matter," and the use of the term "deficiency" instead of "violation" is further confirmation that Congress never intended to allow a citizen suit based on a states' failure to

21

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

enforce or implement a SIP. *Korleski*, 681 F.3d at 350.

To take another example, in Section 113 of the Act, Congress carefully distinguished between a person's "violation" of a SIP and a "State failure to enforce" a SIP. Section 113 states in relevant part as follows: "whenever . . . the Administrator finds that *any person* has violated or is in violation of any requirement or prohibition" of a SIP, the Administrator can "issue an order requiring such person to comply," "issue an administrative penalty," or "bring a civil action." 42 U.S.C. § 7413(a)(1)(A)-(C) (emphasis added). If, on the other hand, the EPA administrator identifies "a failure of *the State* in which the [SIP] applies to enforce the plan or permit program effectively," the Administrator can to step into the shoes of the State and enforce the SIP. *Id*. § 7413(a)(2) (emphasis added). Section 113 clearly distinguishes between a "violation" of a SIP by any person and the "failure of the State . . . to enforce" the SIP. As the Court explained in *Korleski*, this language is further evidence that a regulatory failure to enforce or implement a SIP is not a "violation" of the SIP as that term is used throughout the Act. *Korelski*, 681 F.3d at 350.

Section 304 itself clearly distinguishes between "violations" of a SIP and a regulatory failure to enforce or implement a SIP. As explained above, Section 304(a)(1) authorizes citizen suits against "any person" who has "violated . . . an emission standard or limitation." Section 304(a)(2), by contrast, authorizes citizen suits against the EPA Administrator "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary." 42 U.S.C. § 7604(a)(2). It is significant that Congress expressly authorized suits against the EPA (and *only* the EPA) for failure to fulfill a regulatory duty. Congress could have inserted the "failure to perform any act or duty" language in Section 304(a)(1), or it could have included states in the list of potential defendants in Section 304(a)(2). But Congress did neither, confirming that it did not intend Section 304(a)(1) to authorize citizen suits based on a State's failure to perform a regulatory act or duty. *See Russello v. U.S.*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.")

**B.  Plaintiffs' Interpretation is Wholly Inconsistent with the Clean Air Act Sanctions Scheme.**

Plaintiffs' interpretation of Section 304(a)(1) is plainly wrong for another reason. As the

Court pointed out in *Korleski*, Plaintiffs' interpretation is inconsistent with the Act's sanctions scheme and, for that matter, the Act's form of cooperative federalism. *Korleski*, 681 F.3d at 350. Plaintiffs allege that they have the right to *compel* the Air District's compliance with the SIP through injunctive relief. This claim is simply not credible, given that *even EPA does not have the authority to compel a state regulator to implement or enforce a SIP. See Brown v. EPA*, 521 F.2d 827, 834 (9th Cir. 1975) (no provision in the Clean Air Act "vest[s] in the Administrator power to compel the states to administer and enforce regulations"); *cf. New York v. United States*, 505 U.S. 144, 188 (1992) ("[t]he Federal Government may not compel the States to enact or administer a federal regulatory program"). In fact, EPA options for enforcing a state's compliance with a SIP are quite limited.[23]

Under Section 113(a)(2), if a state fails to enforce or implement a SIP, EPA can take over administration of the SIP. 42 U.S.C. § 7413(a)(2) (if a State has "fail[ed] . . . to enforce the plan or permit program effectively," EPA may itself "enforce any requirement or prohibition of such plan.") Under Section 179(b), if EPA finds that a state has failed to implement any requirement of a SIP, EPA can withhold federal highway funds from the state and/or require emissions from new and modified sources be offset by a ratio as high as 2 to 1. 42 U.S.C. § 7509. Simply put, EPA at most can *induce* a state to comply with a SIP; it cannot *compel* a state to comply. It defies logic to suggest that Congress intended to give significantly *more* enforcement authority to citizens than to the EPA.

Plaintiffs' interpretation of Section 304(a)(1) is inconsistent with the Act's sanctions scheme in another way. Under Section 179(a), EPA cannot impose sanctions against a state failing to implement or enforce a SIP until 18 months after EPA has provided notice of the deficiency. 42 U.S.C. § 7509(a). As the Court noted in *Koreleski*, the "obvious" purpose of the 18-month "waiting period" is to encourage EPA and a state to "work out their differences" before sanctions are imposed, in the spirit of cooperative federalism.[24]   *Korelski*, 681 F.3d at 350. In contrast, under

---

[23] EPA can, of course, compel *polluters* to comply with a SIP under Section 113. 42 U.S.C. § 7413(a)(1)(A).

[24] In fact, EPA and the District are currently working through the cooperative process envisioned by the Clean Air Act to correct any deficiencies in the equivalency demonstration system. See, *Limited Approval and Limited Disapproval of California Air Plan Revisions; San Joaquin Valley Air Pollution Control District* 87 Fed.Reg. 45730 (July 29, 2022) (Proposed Rule).

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1775651.1

Plaintiffs' interpretation of Section 304(a)(1), Plaintiffs would be entitled to "immediate, compulsory relief" in the form of an injunction requiring compliance.  As the Court noted in *Korelski*, such a result would "make[] nonsense of the more deliberate and cooperative regime set forth in 42 U.S.C. § 7509."  *Id.*

      C.    <u>**Cases Cited by Plaintiffs During the Meet and Confer Process Have No Relevance Here**</u>.

      Counsel for all parties met via Zoom on June 7, 2023 to discuss this Motion to Dismiss.  I presented the Air District's position that the Court lacks jurisdiction, and the Complaint fails to state a claim upon which relief can be granted, because Section 304(a)(1) does not authorize a citizen suit against a regulator based on failure to enforce, implement, or otherwise comply with a SIP.  In support of this position, I cited the *Bennett*, *Korleski*, and *San Francisco* cases.  In an email two days later, counsel for Plaintiffs stated Plaintiffs' intention to oppose our Motion.  He expressed his view that citizen suits against states under Section 304(a)(1) "are authorized for violating SIP strategies" and "citizens can enforce SIP strategies against states."  In support of his view, he cited three cases: *League to Save Lake Tahoe v. Trounday*, 598 F.2d 1164 (9th Cir. 1979); *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692 (9th Cir. 2004); *Committee for a Better Arvin v. U.S. E.P.A.*, 786 F.3d 1169 (9th Cir. 2015).

      None of the cases cited by Plaintiffs' counsel are relevant here.  None of them addressed the issue raised by this motion: whether Congress intended that Section 304(a)(1) be used to challenge *regulatory activities* as opposed to the activities of *regulated parties*.  None of the cases even mention, let alone discuss, the *Bennett, Korelski*, or *San Francisco* cases or their application to a citizen suit under Section 304(a)(1).

///

////

////

////

////

///

24

1

**<u>Conclusion</u>**

2

 For the reasons set forth above, this Court should dismiss the case for lack of jurisdiction

3

and/or failure to state a claim upon which relief can be granted.

4

 DATED:  June 15, 2023                    WOODRUFF & SMART, APC

5

6

 By:_____

7

 BRADLEY R. HOGIN

8

 Attorneys for Defendants THE SAN JOAQUIN
 VALLEY UNIFIED AIR POLLUTION CONTROL
 DISTRICT AND THE GOVERNING BOARD OF

9

 THE SAN JOAQUIN VALLEY UNIFIED AIR
 POLLUTION CONTROL DISTRICT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1775651.1

# DECLARATION OF BRADLEY R. HOGIN

I, BRADLEY R. HOGIN, hereby declare:

1. I am an attorney, duly licensed to practice law before all the Courts of the State of California. I am a Director and Shareholder of Woodruff & Smart, A Professional Corporation, and counsel of record for the SAN JOAQUIN VALLEY AIR POLLUTION CONTROL DISTRICT and THE GOVERNING BOARD OF THE SAN JOAQUIN VALLEY AIR POLLUTION CONTROL DISTRICT, (collectively the "Air District") in this action. I have personal knowledge of the matters stated in this Declaration, and if called as a witness, I could and would testify thereto.

2. This declaration is submitted in support of the Notice of Motion and Motion to Dismiss.

3. In compliance with Section 1.d. of the Court's Standing Order, I arranged for the parties to meet and confer regarding the issues raised in this Motion. On June 7, 2023, counsel for all parties to this action met and conferred via Zoom regarding the Motion to Dismiss. During this meeting, I explained that the Air District planned to file a Motion to Dismiss on the grounds that the Court lacks jurisdiction. In support of this position, I cited the United States Supreme Court's decision in *Bennett v. Spear*, 520 U.S. 154 (1997); the Sixth Circuit's decision in *Sierra Club v Korleski*, 681 F.3d 342 (6th Cir. 2012); and the Ninth Circuit's decision in *City and County of San Francisco v US Dept of Transportation*, 796 F.3d 993 (2015). I explained that, under these authorities, Section 304(a)(1) cannot be used to challenge regulatory action by an air pollution control district. At that time, counsel for plaintiffs indicated that they would consider the issue.

4. On June 9, 2023 I received an email from Brent Newell, counsel for Plaintiffs. Mr. Newell stated that Plaintiffs' counsel respectfully disagree with the Air District's position, and Plaintiffs intend to oppose the Motion to Dismiss. Mr. Newell cited three cases for the propositions that citizen suits against states "are authorized for violating SIP strategies" and/or "citizens can enforce SIP strategies against states": *League to Save Lake Tahoe v. Trounday*, 598 F.2d 1164 (9th Cir. 1979); *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692 (9th Cir. 2004); *Committee for a Better Arvin v. U.S. E.P.A.*, 786 F.3d 1169 (9th Cir. 2015).

///

////

///

1775651.1

1    I declare under penalty of perjury under the laws of the United States that the foregoing is

2  true and correct.  Executed this 15th day of June 2023, in Costa Mesa, California.

3

4                                              _____

5                                              BRADLEY R. HOGIN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1775651.1

## **PROOF OF SERVICE**

## **STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am over the age of 18 and not a party to the within action; I am employed by WOODRUFF & SMART in the County of Orange at 555 Anton Boulevard, Suite 1200, Costa Mesa, CA 92626-7670.

On June 15, 2023, I served the foregoing document(s) described as **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES (FRCP 12(B)(1), 12(B)(6); DECLARATION OF BRADLEY R. HOGIN**

☐     by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list;

☐     **(BY MAIL)** I placed said envelope(s) for collection and mailing, following ordinary business practices, at the business offices of WOODRUFF & SMART, and addressed as shown on the attached service list, for deposit in the United States Postal Service. I am readily familiar with the practice of WOODRUFF & SMART for collection and processing correspondence for mailing with the United States Postal Service, and said envelope(s) will be deposited with the United States Postal Service on said date in the ordinary course of business.

☒     **(BY ELECTRONIC SERVICE)** I caused the above-referenced document to be transmitted to the interested parties vie electronic mail as stated on the attached service list.

☐     **(BY OVERNIGHT DELIVERY)** I placed said documents in envelope(s) for collection following ordinary business practices, at the business offices of WOODRUFF & SMART, and addressed as shown on the attached service list, for collection and delivery to a courier authorized by _____ to receive said documents, with delivery fees provided for. I am readily familiar with the practices of WOODRUFF & SMART for collection and processing of documents for overnight delivery, and said envelope(s) will be deposited for receipt by _____ on said date in the ordinary course of business.

☐     **(BY PERSONAL SERVICE)** I delivered such envelope(s) by hand to the offices of the addressee(s).

☐     (State)     I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒     (Federal)   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

Executed on June 15, 2023 at Costa Mesa, California.

_/s/ Katie E. Kane_____
Katie E. Kane

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1775651.1

### CENTRAL VALLEY AIR QUALITY COALITION et al. v. SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT et al.

### Case No. 1:23-cv-00794-ADA-SKO

### SERVICE LIST

BRENT J. NEWELL                                    ***Attorneys for Plaintiffs***
LAW OFFICES OF BRENT J. NEWELL
245 Kentucky Street, Suite A4
Petaluma, CA 94952
Telephone: (661) 586-3724
Email: brentinewell@outlook.com

RICHARD T. DRURY                                   ***Attorneys for Plaintiffs***
VICTORIA YUNDT
LOZEAU DRURY, LLP
1939 Harrison Street, Suite 150
Oakland, CA 94612
Telephone: (510) 836-4200
Email: richard@lozeaudrury.com
Email: victoria@lozeaudrury.com

GRECIA OROZCO                                      ***Attorneys for Plaintiffs***
CENTER ON RACE, POVERTY & THE ENVIRONMENT
1012 Jefferson Street
Delano, CA 93215
Telephone: (562) 659-5314
Email: gorozco@crpe-ej.org

1775651.1